Philip CLAY and Clark Singleton

v.

LYKES BROS. STEAMSHIP CO., INC.

Civ. A. No. 79–2498, 80–1843.

United States District Court,
E. D. Louisiana.

Oct. 14, 1981.

Stanley J. Jacobs, Lawrence D. Wiedemann, Trial Atty., New Orleans, La., for plaintiff.

William E. Wright, Trial Atty., Roger D. Allen, New Orleans, La., for defendant.

Patrick E. O'Keefe, New Orleans, La., for intervenor.

DUPLANTIER, District Judge.

Plaintiffs, two longshoremen employed by an independent stevedoring company, were injured while unloading cargo from the hold of a "lash"[1] barge owned by defendant Lykes Brothers Steamship Co. (Lykes). Their claim under Section 5(b)[2] of the Longshoremen's and Harbor Workers' Compensation Act, based upon the alleged negligence of the barge owner, was tried on the issue of liability only, quantum of damages to be determined later, if necessary. The court concludes that Lykes was negligent, that its negligence was the cause of plaintiffs' injuries, and that plaintiffs were not contributorily negligent. Defendant is therefore liable to plaintiffs.

## FACTS

As is customary with lash barge operations, the lash barge on which plaintiffs were injured was loaded with cargo prior to being placed upon the "mother" ship. The cargo was loaded on the barge in London by independent stevedores under contract with defendant Lykes, under the general supervision of employees of Killick Martin and Company, Lykes' general agent in the United Kingdom. Two cargo containers were loaded first, side by side, their forward ends against the forward part of the barge. One of the lashings on the inboard container was a cable running from the inboard stern bottom corner of the container and laid along the deck of the barge to its outboard bulkhead, where it was made fast to a pad-eye on the bulkhead.

Each container is constructed with three holes near each corner, including the bottom corners, one hole in each upright side of the container and one in its bottom. Each hole is several inches from the corner; cable can be run through these holes in order to secure the containers. The evidence is unclear as to whether the cable in question was run through the two holes in the upright sides of the container or through the hole in the bottom of the container and one of the holes in the side of the container. On the day after the containers were loaded onto the barges, bundles of steel tubing were loaded upon the deck of the barge on top of the cable; the bundles of steel were loaded between the inboard side of the inboard container and the far side of the barge. They were separated from the container, if at all, only by one depth of dunnage, leaving no opening through which the cable could be seen. The bundles of steel were stacked approximately four feet high, with the ends protruding toward the stern of the barge well past the ends of the two containers.

---

1. An acronym for "lighter aboard ship." For a description of the "lighter aboard ship" or "lash" type ship and its barges, see *Agrico Chemical Co. v. SS Atlantic Forest*, 459 F.Supp. 638 (E.D.La.1978).

2. 33 U.S.C. Sec. 905(b)

The barge and its cargo arrived in New Orleans with the lashing cable intact, on the deck of the barge below the steel pipe bundles. Plaintiffs and the rest of their stevedoring crew began to unload the barge in the customary manner; the plan was to remove the inboard container first. Following customary safe unloading methods, plaintiffs began to unload the container, not realizing that the steel cable was run through its bottom corner, under the bundles of steel pipe which were still in place, and tied to the far bulkhead of the barge. As the crane raised the container, the cable was placed under tension. Within a very brief time, the cable broke under the strain, causing the container to swing about suddenly and haphazardly. Plaintiff Clay was injured when he was struck by the container, and plaintiff Singleton was injured when he jumped from another container to avoid being struck. Just before the cable broke, plaintiffs noticed the cable for the first time, stretched tight under strain. They immediately signalled the crane operator, but before the strain could be reduced the cable parted.

## THE NEGLIGENCE OF LYKES

■ There is no question but that parties who are not before the court, the riggers in London who tied the cable and the stevedores who placed the bundles of pipe on top of the cable, were negligent and that this negligence was a cause of the resultant accident and injuries to plaintiffs. There was no necessity to secure the cable in this manner; safe alternatives were available. Once the cable was covered with the bundles of steel tubing, it was clearly foreseeable that the accident would occur in just the manner in which it did. The unloading stevedores had no reason to suspect that the container would be secured by a cable beneath the steel pipes.

Under section 905(b), Lykes is not responsible for the negligence of the stevedores who tied the cable and covered it with the bundles of steel pipe. Moreover, the fact that the barge was unseaworthy does not afford a remedy to a longshoreman under 905(b). The question is whether Lykes itself as "vessel owner" was negligent with respect to the dangerous condition which caused plaintiffs' injuries.

*Scindia Steam Navigation Co. v. de los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), adopted the general maritime standard of reasonable care under the circumstances as the negligence standard for section 905(b) cases. In describing the vessel's duty the Court stated:

This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. *Id.* at 1621.

■ Lykes did not create the condition, nor is it liable for the activities of the London stevedores who did. There is no evidence that Lykes had actual knowledge of the dangerous condition. Constructive knowledge cannot be based upon a failure to supervise or inspect the loading operation. *Scindia,* supra; *Munoz v. Flota Merchante Grancolombiana, S.A.,* 553 F.2d 837 (2d Cir. 1977). However, the vessel owner does have the duty to inspect the cargo for dangerous conditions resulting from the work of the loading stevedores. In *Turner v. Japan Lines, Ltd.,* 651 F.2d 1300, 1304 (9th Cir. 1981), the court in recognizing this duty stated that the vessel owner had, ". . . a duty to protect the plaintiff (an unloading longshoreman) against concealed dangers created by a foreign stevedore which the vessel could, in the exercise of reasonable care, have corrected or warned of."

We find here, as did the 9th Circuit in *Turner, supra,* a breach of the duty of the vessel owner to exercise reasonable care to discover concealed dangers created by a foreign stevedore. Had that reasonable care been exercised, Lykes would have been aware of the dangerous condition and could easily have corrected it, or warned plaintiffs and other offloading longshoremen and thus prevented the accident and resulting injuries. We find a breach of the vessel owner's duty, after the loading stevedore has completed his operations, to see that the vessel with its cargo as stowed is not a trap for unsuspecting unloading longshoremen.

We hold a vessel owner negligent for not discovering a hidden trap but the unloading longshoremen not negligent for failing to discover the same trap, because the vessel owner should have superior knowledge and expertise concerning cargo storage and lashing. A higher standard is to be applied to a vessel owner than to individual longshoremen such as the plaintiffs. The individual longshoreman is not charged with the knowledge of how a particular cargo should be stowed and lashed. He is only obligated to know, by visual inspection, how the cargo is apparently actually stowed and lashed and to conduct unloading operations accordingly. Consequently, he cannot be found negligent for failing to discover a lashing which was not visible. The vessel owner on the other hand should know not only how a particular cargo is lashed but also how it should be lashed to insure cargo safety as well as the safety of unloading longshoremen. The vessel owner should examine the finished product of the loading stevedore's work and make certain that the cargo is lashed as it should be and that the lashing plan used creates no hidden condition dangerous to unloading longshoremen.

The fact that no lashing was visible on a container stowed immediately adjacent to expensive steel tubes which required special protection from damage which could be caused by a shifting of the container should have alerted defendant's agents to the fact that the dangerous cable lay beneath the tubes.[3]

The duty to discover dangerous conditions and to warn the unloading longshoremen arises partially because between the vessel owner and the stevedore-employer only the vessel owner has sufficient control over the vessel and its activities to insure the safety of the unloading longshoremen. *Turner, supra.* The unloading longshoremen have no communication with and no control over the onloading stevedore. In contrast, the vessel owner communicates with both the onloading and the unloading stevedores, and while the vessel owner has no duty to supervise the onloading stevedores his duty to examine the completed assignment coupled with his superior knowledge of stowage and lashing enable him to warn the unloading stevedore of any dangerous conditions created by the loading stevedore.

The Fifth Circuit, in what is probably its first *post-Scindia* opinion, recently reversed a district court's *pre-Scindia* judgment n. o. v. after a jury verdict holding a ship owner liable for injuries to an unloading longshoreman caused by improper methods used by an independent stevedore. *Lemon v. Bank Lines,* 656 F.2d 110, 5th Cir. 1981. While there was evidence that the chief mate had actual knowledge of the improper loading technique, the court stressed that in *Scindia* the Supreme "Court specifically imposed a duty on the shipowner to at least warn the stevedore of any dangerous condition, existing at the outset of the stevedoring operations, of which the shipowner should have been aware through the exercise of reasonable care."

We hold that Lykes should have been aware through the exercise of reasonable care that the dangerous cable was in place, hidden from unloading longshoremen, and that as shipowner it had a duty at least to warn plaintiffs of the dangerous condition existing at the outset of their stevedoring operations.

3. Lykes was represented by a general agent in London; Lykes is responsible for the negligence of the employees of that agent while they are working on Lykes vessels.

## CONTRIBUTORY NEGLIGENCE

Plaintiffs were not contributorily negligent. A serious question of contributory negligence would arise if the evidence indicated that the cable was tied through the hole in the upright end (not the side) of the container, thus making it visible to plaintiffs. On this issue, defendant has the burden of proof, and it has not been met. It is just as likely, and indeed more likely, that the cable was passed through the bottom hole and the hole in the side, neither of which was visible because of the position of the steel pipe until the container was lifted. The only other issue as to contributory negligence involves the delay between the time that the cable became apparent and the warning to the crane operator. We conclude that there was virtually no delay involved and that the cable parted before anyone could take remedial action.