United States Court of Appeals,

Fifth Circuit.

No. 93-3902.

Ray COUCH, III, Plaintiff-Appellee,

v.

CRO-MARINE TRANSPORT, INC., et al., Defendants,

James J. Flanagan Shipping Corporation, Defendant-Appellant.

BERISFORD METALS CORPORATION, d/b/a Erlanger & Co., Third-Party Plaintiff,

v.

CENTRAL ILLINOIS DOCK COMPANY, Third-Party Defendant Intervenor-Appellee,

v.

JAMES J. FLANAGAN SHIPPING CORPORATION, Third-Party Defendant-Appellant.

Feb. 13, 1995.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before GARWOOD, JOLLY and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellee longshoreman Ray Couch (Couch) filed this suit against Cro-Marine-Transport (Cro-Marine), Berisford Metals Corporation/Erlanger and Company (Erlanger), and James J. Flanagan Shipping Corporation, d/b/a New Orleans Stevedoring Company (NOSC), for injuries sustained while unloading steel cargo from a Cro-Marine barge in Peoria, Illinois. Erlanger was the owner of the steel cargo, and NOSC was the stevedore that loaded the steel into the barges in the port of New Orleans. After the district court

1

dismissed the claims against Cro-Marine and Erlanger, Couch proceeded with his suit against NOSC and recovered a $1,722,640 judgment in a bench trial. Defendant-appellant NOSC appeals, raising several factual and legal issues. We affirm in part, vacate in part, and remand.

## Facts and Proceedings Below

Couch, a longshoreman employed by Central Illinois Dock Company (CIDC), was injured while discharging steel cargo from Cro-Marine barge VL-8141 in Peoria, Illinois, on December 14, 1987. As a result of his injuries, Couch's leg was amputated above the knee. The steel destined for Peoria had arrived in the port of New Orleans aboard the M/V UCKA. Thereafter, the owners of the M/V UCKA hired NOSC to discharge the M/V UCKA and transload the steel cargo onto three Cro-Marine barges, including barge VL-8141, for the trip upriver to Peoria. The steel cargo consisted of bundles of steel billets of various sizes, steel coils, and steel bars.

Chander Gorowara, an independent marine surveyor hired by the cargo owner Erlanger, inspected and photographed the steel cargo in New Orleans while it was stacked in a wharf storage shed and again after NOSC loaded it into the barges bound for Peoria. These photographs, introduced into evidence at trial, show the condition of the cargo and its stow in the barges bound for Peoria. As depicted by the photographs of the stow in the storage shed, NOSC neatly stacked the steel bundles in tiers with wood dunnage placed between the layers. By contrast, the photographs of the stow in the barges, particularly barge VL-8141, reveal that NOSC

2

haphazardly dumped irregular piles of steel into the barges. Several of the piles were dropped in the barge at an angle instead of being stacked to provide a walking surface for the discharging stevedore. Moreover, NOSC used dunnage irregularly and as a bridge to support the weight of the steel instead of its intended use as a separation.[1]

Tugs accompanied the unmanned barges on the voyage upriver to Peoria. Erlanger hired CIDC, a Peoria stevedoring company with over thirty years' experience on the Illinois River, to discharge the steel from the barges to trucks for shipment to the Caterpillar Truck Company, also in Peoria. Ninety-five percent of CIDC's business consists of discharging vessels, and steel accounts for about ninety percent of the cargo it unloads. After personally inspecting the barges, Daniel McNally (McNally), the owner and president of CIDC, described the stow as one of the worst barge loads he had ever seen. There were four or five distinct piles of steel bundles jammed against each other with broken dunnage throughout the barge. McNally noticed bundles not separated by dunnage and overhanging bundles ready to fall over.

CIDC had more experience in discharging steel cargo than any other stevedore in the area. McNally decided that CIDC would proceed carefully to discharge the steel from the barges. McNally assigned a crew consisting of a crane operator, two laborers, one

---

[1]The district court observed that NOSC was paid to discharge the M/V UCKA at a fixed price per metric ton rather than at an hourly rate, thus providing an incentive to load the barges as quickly as possible.

of whom was Couch, a superintendent, and a truck driver to unload the barge. At the time of the accident, Couch had three months of experience unloading barges. Cohenour, the laborer assisting Couch, had one and one-half years of experience.

The unloading operation consisted of the crane operator lowering a block with two attached choker chains into the cargo area. Cohenour and Couch, positioned at either end of the piles of steel, would wrap the choker chains around the ends of the bundle of steel billets to be unloaded. At this point, Cohenour would signal the crane operator to lift the bundles out of the barge and onto the truck.

Due to the haphazard dump stow of the steel and the insufficient and improper use of dunnage, Couch and Cohenour had difficulty getting the chains around the bundles and needed to use pry bars to lift up the bundles so that the chains could be placed around the ends. Moreover, the crane operator occasionally had to pick up one end of a bundle so that chains could be placed around the other end. This operation proceeded for some twenty-one hours until only eight bundles, located in the starboard bow of barge VL-8141, remained to be unloaded. These bundles were leaning against the rake of the bow and were arranged so that there were three bundles on the bottom, two in the middle, and three on the top, the weight of the top three bundles being supported by the two bundles in the middle.

Couch and Cohenour then attempted to unload two of the top bundles positioned closest to them. Because these bundles were

4

pressed against the rake of the bow, the crane operator lifted one end of either one or two of these bundles and set them down. Couch, who was closest to the bow, was trying to wrap the chains around the ends of the two bundles when he heard a crack. A one and one-half to four ton bundle of steel billets fell and crushed Couch's left leg. At the time of the accident, the crane operator was still awaiting a signal from Cohenour.

After five unsuccessful surgical procedures, Couch's physicians amputated his leg above the knee. Since the initial amputation, Couch has undergone additional surgery, including stump revision, bringing the total number of surgeries to fourteen at the time of the district court judgment. Couch now wears a prosthetic device, which requires maintenance and regular part replacement due to his active lifestyle. Couch suffers severe ghost pains in his leg and has also endured back and knee pain due to the pressure his activities place on those muscles. Couch was twenty-seven years old at the time of his injury. Prior to the accident, he had led a very active life, was a black belt in karate and an amateur boxer aspiring to turn professional. Before the accident, Couch worked approximately forty hours per week earning $9.25 per hour.

At his own initiative and expense, Couch enrolled in community college after the accident to train for another career as a diesel mechanic. In December 1992, he returned to work for CIDC as a diesel mechanic, eventually working twenty-four hours each week at $11.25 per hour, approximately the same hourly rate he would be earning if he had not been injured. Shortly after starting work as

5

a diesel mechanic, Couch's condition forced him to take off approximately one month. Couch still hopes to work five days a week, but that will depend upon the strain such a schedule puts on his body.

Couch originally filed suit in the United States District Court for the Central District of Illinois against Cro-Marine, the owner of the barge, and Erlanger, the owner of the steel cargo. He subsequently amended his complaint to name NOSC as a defendant. After NOSC objected to venue in the Central District of Illinois, the entire proceeding was transferred to the Eastern District of Louisiana. Prior to trial, the district court granted Cro-Marine and Erlanger's motions for summary judgment and dismissed them from the action. NOSC filed a third-party complaint against CIDC seeking indemnity and contribution. CIDC also remained in the litigation as an intervenor seeking to recover amounts paid to or on behalf of Couch under the Illinois Workers' Compensation Act (IWCA).

After a bench trial, the district court entered a judgment against NOSC awarding Couch $1,722,640. This award included $134,225 for past medical and prosthesis expenses, $150,000 for future medical and prosthesis expenses, $88,415 for past wage losses, $200,000 for future loss of earning capacity, and $1,150,000 for physical pain and suffering, disability, impairment, and mental anguish. Because Couch received IWCA benefits from his employer CIDC, the district court held that CIDC was entitled to recover from his award the amount spent on medical expenses

6

($134,225) and the compensation benefits paid ($71,105), subject to a credit of 25% attorneys' fees in favor of Couch and his counsel. Finally, the district court awarded interest from the date of the entry of the judgment on the award of future medical expenses and future loss of earning capacity. On the past medical expenses, past lost wages and the $1,115,000 pain and suffering award, the district court awarded interest from the date of the injury.

### Discussion

I. Applicability of *Scindia*

The Longshore and Harbor Workers' Compensation Act (LHWCA) establishes a comprehensive framework to provide a federal workers' compensation program for longshoremen injured or killed in job-related accidents. 33 U.S.C. §§ 901-950; Gilmore & Black, *The Law of Admiralty* 408-412 (1975). The 1972 congressional amendments to the LHWCA "were the first significant effort to reform the 1927 Act and the judicial gloss that had been attached to it." *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 261, 97 S.Ct. 2348, 2356, 53 L.Ed.2d 320 (1977). Prior to 1972, an injured longshoreman could receive benefits from his stevedore-employer under LHWCA and also recover damages from the shipowner for injuries caused by the negligence or unseaworthiness of the vessel being serviced. Gilmore & Black, *The Law of Admiralty* 411 (1975). In order to prevail in an unseaworthiness cause of action, the longshoreman did not have to prove fault on the part of the shipowner but only needed to show an unsafe, injury-causing condition on the vessel. *Seas Shipping Co. v. Sieracki,* 328 U.S.

7

85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Under the *Sieracki* doctrine, a shipowner could be held liable even if the stevedore created or caused the injury-causing condition. *See, e.g., Crumady v. The Joachim Hendrik Fisser,* 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959).[2] Moreover, the shipowner thus held liable to the longshoreman could maintain an indemnity action against the stevedore for breach of an implied or express warranty to handle the cargo in a reasonably safe manner. *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).

The Supreme Court has described the 1972 amendments as a legislative compromise between three groups: (1) shipowners dissatisfied with decisions permitting longshoremen compensated under LHWCA to recover in unseaworthiness actions; (2) stevedores subject to indemnification suits by vessel owners; (3) longshoremen seeking increased compensation benefits. *Northeast Marine Terminal Co.,* 432 U.S. at 263-65, 97 S.Ct. at 2357. Discussing the 1972 amendments, the Supreme Court has stated, "The design of these changes was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." *Howlett v. Birkdale Shipping Co., S.A.,* --- U.S. ----, ----, 114 S.Ct. 2057, 2063, 129 L.Ed.2d 78 (1994).

---

[2]In *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971), the Supreme Court held that a single act of operational negligence by the stevedore did not render the vessel unseaworthy.

The legislative compromise incorporated in the 1972 amendments radically reformulated the triangular relationship between vessel owners, stevedores, and longshoremen. First, Congress substantially increased the benefits payable to longshoremen under the LHWCA. Second, the amendments abolished the longshoreman's right to recover from the shipowner for unseaworthiness. Finally, Congress eliminated the stevedore's obligation to indemnify the shipowner if it was held liable for damages suffered by the longshoreman. Gilmore & Black, *The Law of Admiralty* 411 (1975). The 1972 amendments, however, preserved a longshoreman's right to recover from the vessel owner for negligence. 33 U.S.C. § 905(b).[3] Because Congress did not recite the acts or omissions of a vessel that would amount to negligence, the scope of the duty owed by a vessel to longshoremen was left to "be resolved through the application of accepted principles of tort law and the ordinary process of litigation." H.R.Rep. No. 92-1441, 92nd Cong., 2nd Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 4698, 4704. In *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S.

_____

[3]33 U.S.C. § 905(b) provides:

> "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred."

9

156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Court articulated the scope of a shipowner's duty to longshoremen under section 905(b) and outlined three general duties shipowners owe to longshoremen. This Court has summarized the three scenarios under which a vessel owner may be liable under *Scindia:*

> "1) if the vessel owner fails to warn on turning over the ship of hidden defects of which he should have known.
>
> 2) for injury caused by hazards under the control of the ship.
>
> 3) if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of "obviously improvident' judgment means to work on in the face of it and therefore cannot be relied on to remedy it." *Pimental v. LTD Canadian Pacific BUL,* 965 F.2d 13, 15 (5th Cir.1992) (citations omitted).

NOSC argues that the duty a loading stevedore owes a discharging longshoreman is equivalent to the duty a shipowner owes a longshoreman under *Scindia.* NOSC asserts that it cannot be liable under *Scindia* because its stow constituted an open and obvious condition, therefore not triggering a breach of the first *Scindia* duty to warn of hidden defects. *Scindia* does hold that in a suit under section 905(b) by a longshoreman against a shipowner, the vessel's duty does not extend to open and obvious conditions. *Scindia,* 451 U.S. at 172-74, 101 S.Ct. at 1625. The district court refused to apply *Scindia,* citing crucial differences between the position of the vessel owner in relation to the discharging longshoremen and the position of the loading stevedore in relation to the discharging longshoremen. We hold that the district court was correct for several reasons.

NOSC argues that *Scindia* applies to the facts of this case and

10

establishes that it owed no duty to protect Couch or any other discharging longshoreman from open and obvious hazards. *Scindia* involved a suit by an injured longshoreman against a shipowner under section 905(b), the longshoreman's statutory right to recover from the vessel owner for negligence as preserved in the 1972 amendments. The LHWCA defines the term "vessel" to mean "any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charter, master, officer, or crew member." 33 U.S.C. § 902(21). Although Couch originally asserted a section 905(b) claim against Cro-Marine as the owner of the unmanned barges, the district court granted Cro-Marine's motion for summary judgment on the grounds that it breached no duty owed to Couch under *Scindia,* thereby eliminating section 905(b) from the suit.[4] NOSC, the onloading stevedore, remained in the litigation as the sole defendant, and Couch proceeded with his cause of action against NOSC under the general maritime law as provided for in the pretrial order.

In its supplemental brief and at oral argument on appeal, NOSC contends that *Howlett v. Birkdale Shipping Co.,* --- U.S. ----, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994), strongly reinforces its argument that the *Scindia* standard should govern the relationship between

---

[4]In the same order, the district court granted defendant Erlanger's motion for summary judgment on the ground that a cargo owner owed no duty with respect to the cargo operations. Couch did not appeal the district court's order dismissing Erlanger and Cro-Marine.

the onloading stevedore and the discharging longshoremen. The issue addressed by the Court in *Howlett,* a section 905(b) suit against a shipowner, was the scope of a shipowner's duty to warn of latent hazards in the cargo stow. Although *Howlett* elaborates the scope of the first *Scindia* duty, it does not help NOSC overcome the insurmountable hurdle of applying the *Scindia* standard to a case involving a suit by an injured longshoreman against a loading stevedore. *Scindia* and *Howlett* are section 905(b) cases brought against shipowners and do not support NOSC's contention that the *Scindia* standard should apply in this case, a negligence suit under the general maritime law against a party other than the vessel owner.

The facts in this case may be somewhat unusual because they involve a domestic onloading stevedore (NOSC) loading a stow which causes injury to a domestic discharging longshoreman (Couch). Perhaps more typically, the vessel being unloaded by the injured longshoreman will have been loaded by a foreign stevedore over whom the discharging longshoreman is unable to obtain jurisdiction, and the injured discharging longshoreman hence sues only the vessel owner for negligence under section 905(b). *See Howlett v. Birkdale Shipping Co., S.A.,* --- U.S. ----, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994) (section 905(b) suit by discharging longshoreman injured when he slipped on a plastic sheet improperly placed in the stow by the loading stevedore in Ecuador); *Woods v. Sammisa Co.,* 873 F.2d 842 (5th Cir.1989), *cert. denied,* 493 U.S. 1050, 110 S.Ct. 853, 107 L.Ed.2d 847 (1990) (section 905(b) suit against shipowner by

12

longshoreman injured while unloading steel pipes improperly loaded by stevedore in Brazil); *Clay v. Lykes Bros. S.S. Co.,* 525 F.Supp. 306 (E.D.La.1981) (section 905(b) suit against vessel owner by two longshoremen injured while unloading cargo negligently loaded by stevedores in London).[5]

The facts of this case give rise to an important distinction between vessel owners and stevedores. The Court in *Scindia* held that a vessel owner has "no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Scindia,* 451 U.S. at 172, 101 S.Ct. at 1624. As support for this rule, the Court discussed at great length the fact that the stevedore is the expert in cargo operations hired by the nonexpert shipowner. *Id.* at 168-74, 101 S.Ct. at 1623-1625. Accordingly, the Court in *Scindia* described "the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of the cargo operations." *Id.* at 172, 101 S.Ct. at 1624.[6]

_____

[5]The court in *Clay* stated "[t]here is no question but that parties who are not before the court, the riggers in London who tied the cable and the stevedores who placed the bundles of pipe on top of the cable, were negligent and that this negligence was a cause of the resultant accident and injuries to plaintiffs." 525 F.Supp. at 308.

[6]The indemnity cases decided before the 1972 amendments reason that "the stevedore was in the best position to avoid accidents during cargo operations and that the shipowner could rely on the stevedore's warranty to perform competently." *Id.* Section 41 of the LHWCA mandates that the stevedore provide its employees with a reasonably safe work place and implement safeguards necessary to prevent injuries. Further, 33 U.S.C. § 941(a). 33 U.S.C. § 941(a) also authorizes the Secretary of

13

In *Scindia* and *Howlett* the Court considered the relationship between and roles of the stevedore-employer and the vessel owner. Emphasizing the role of the stevedore-employer as a specialist in cargo operations on one side and the nonexpert vessel on the other side, the Court reasoned that, as between these two parties, the stevedore-employer was in the best position to prevent injuries to longshoremen. Unlike the shipowner in *Scindia,* NOSC, as loading stevedore, is indeed an expert in cargo operations, thus creating a very different relationship, with experts in stevedoring on both sides. Therefore, the reasoning of the Court in *Scindia* for crafting a limited scope of liability for the nonexpert vessel based on the justifiable expectations of the shipowner does not logically apply to the facts of this case. Accordingly, based on the facts of this case, the onloading stevedore was in the best position to avoid creating a dangerous stow and therefore may be held liable for any injuries suffered by discharging longshoremen caused by its negligent stow.[7]

---

Labor to promulgate regulations to protect the life, health, and safety of longshoremen. For example, an OSHA regulation governing cargo stows provides:

> "(a) When necessary, cargo shall be secured or blocked to prevent its shifting or falling.
>
> (b) In breaking down, precautions shall be taken, when necessary, to prevent the remaining cargo from falling." 29 C.F.R. § 1918.83(a)-(b).

[7]By way of analogy, the district court observed that a stevedore may be held liable for cargo damage due to its negligence. *Maurice Pincoffs Co. v. Dravo Mechling Corp.,* 697 F.Supp. 244, 249-50 (E.D.La.1987), *aff'd without op.,* 880 F.2d 411 (5th Cir.1989) (holding that an unloading stevedore has a duty to exercise reasonable care and may be liable for any damage

NOSC argues that the purpose of the 1972 amendments to the LHWCA was to shift the responsibility for compensating injured longshoremen to the party best able to prevent injuries, the stevedore-employer. In order to further this congressional purpose, NOSC contends that we should apply *Scindia* and *Howlett* to place the responsibility for compensating Couch on his stevedore-employer. The *Scindia* Court described the 1972 amendments abolishing a longshoreman's unseaworthiness cause of action against a vessel owner as reflecting congressional intent "to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore." *Scindia,* 451 U.S. at 168, 101 S.Ct. at 1622-23. Therefore, the Court in *Scindia* reasoned that it would be inconsistent with the LHWCA as amended in 1972 to hold that a shipowner has a continuing duty to discover and remedy dangerous conditions that develop during the loading or unloading of cargo. As the Court observed:

> "Such an approach would repeatedly result in holding the shipowner solely liable for conditions that are attributable to the stevedore, rather than the ship. True, the liability would be cast in terms of negligence rather than unseaworthiness, but the result would be much the same. "[C]reation of a shipowner's duty to oversee the stevedore's activity and insure the safety of longshoremen would ... saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905(b).' " *Id.* [at 169, 101 S.Ct.] at 1623 (citations omitted).

When Congress enacted the 1972 amendments, it adjusted the rights between shipowners, stevedore-employers, and longshoremen.

---

done to the cargo due to its negligence).

15

Applying the 1972 amendments to the facts of this case, the three affected parties are Cro-Marine as the barge owner, CIDC as the stevedore-employer, and Couch as the injured longshoreman. The 1972 amendments, however, did not purport to adjust the rights of one stevedoring company versus another stevedoring company for injuries sustained by longshoremen. Thus, the 1972 amendments and Court decisions interpreting section 905(b) do not affect the outcome of Couch's suit against NOSC under the general maritime law.

We are not persuaded by NOSC's contention that *Scindia* 's trilogy of duties should apply to the loading stevedore/discharging stevedore or longshoreman relationship. A review of the *Scindia* duties reinforces our conclusion that the *Scindia* duties were formulated specifically to govern section 905(b) suits between vessel owners and injured longshoremen. For example, under the third *Scindia* duty, a shipowner has a duty to intervene in the stevedore's operations when it knows of the hazard and knows that the stevedore cannot be relied upon to remedy it. *Scindia,* 451 U.S. at 176-78, 101 S.Ct. at 1627. Because a loading stevedore such as NOSC will never be present when the discharging stevedore unloads the cargo, the loading stevedore could not be liable under the third duty.[8] As the facts of this case demonstrate, NOSC was not present in Peoria, Illinois, when CIDC unloaded the cargo.

---

[8]The only conceivable way a loading stevedore could be held liable under the third *Scindia* duty would be if someone informed it that the discharging stevedore could not be relied on to remedy the situation.

16

Again, this distinction underscores the thrust of *Scindia,* which was to prevent resuscitating, albeit under a negligence label, the unseaworthiness cause of action abolished in 1972 and not to reformulate the general maritime law governing negligence suits brought against a party other than a vessel owner.

II. Standard of Care

Having determined that *Scindia* does not apply to the facts of this case, we must turn to the issue of the duty owed by a loading stevedore to a discharging longshoreman.  We hold that a loading stevedore must load the cargo so that an expert and experienced stevedore will be able to discharge the cargo with reasonable safety by exercising reasonable care.  *Federal Marine Terminals, Inc. v. Burnside Shipping Co.,* 394 U.S. 404, 414-15, 89 S.Ct. 1144, 1150, 22 L.Ed.2d 371 (1969).  We find that the district court applied the correct standard of care under the general maritime law and thus will not disturb the district court's finding that NOSC's drop stow was such that an expert and experienced stevedore could not, despite the exercise of reasonable care, safely unload the steel cargo.  Accordingly, we reject NOSC's argument that the district court improperly applied a general layman's reasonableness standard.[9]

---

[9]In its brief, NOSC seizes upon the district court's phrase "reasonable care under the circumstances" as evidence that the district court improperly applied a general layman's reasonableness standard.  The phrase "reasonable care under the circumstances" is merely a way of paraphrasing the applicable standard of care.  In fact, the Court in *Scindia* employed this shorthand to describe the precedent upon which NOSC relies:

"We held in *Marine Terminals v. Burnside Shipping*

17

## III. District Court Findings

NOSC contends that the district court's findings that it was negligent and that CIDC was not contributorily negligent are clearly erroneous. We disagree. We review a district court's findings of fact for clear error and will not reverse a finding of fact unless a review of the entire record leaves us "with the definite and firm conviction that a mistake has been committed." *Nichols v. Petroleum Helicopters, Inc.,* 17 F.3d 119, 121 (5th Cir.1994) (citation omitted). We hold that the evidence taken as a whole adequately supports the district court's findings.[10]

NOSC next argues that the district court erred in calculating the damages for pain and suffering and future wage losses. We disagree again. Based upon our review of the record as a whole, we

*Co.,* that the vessel owes to the stevedore and his longshoremen employees the duty of exercising due care "under the circumstances.' This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property...." *Scindia,* 451 U.S. at 166-67, 101 S.Ct. at 1622 (citations omitted).

[10]Because we uphold the district court's finding that CIDC was not negligent, we need not reach NOSC's claim that the district court improperly denied its contribution claim against CIDC.

NOSC also argues that the district court applied the improper causation standard. NOSC asserts that its negligence, if any, was not the legal cause of Couch's injuries, instead alleging CIDC was negligent in repositioning the steel bundles during the offloading process. Because we uphold the district court's findings that NOSC was negligent and that CIDC was not negligent, we reject NOSC's argument and hold that the district court applied the correct causation standard.

18

are unable to conclude that the district court's damage awards are clearly erroneous.

IV. Prejudgment Interest

NOSC also challenges the district court's award of prejudgment interest on the entire $1,150,000 pain and suffering award. The award of prejudgment interest in admiralty cases "is the rule rather than the exception, and, in practice, is well-nigh automatic." *Reeled Tubing, Inc. v. M/V Chad G,* 794 F.2d 1026, 1028 (5th Cir.1986) (citation omitted). Prejudgment interest, however, may not be awarded with respect to future damages. *Boyle v. Pool Offshore Co., Div. of Enserch Corp.,* 893 F.2d 713, 719 (5th Cir.1990); *Pickle v. International Oilfield Divers, Inc.,* 791 F.2d 1237, 1241 (5th Cir.1986), *cert. denied,* 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987).

In *Boyle,* this Court vacated the district court's award of prejudgment interest on plaintiff's $195,910 recovery for general pain and suffering and remanded it to the district court to calculate what proportion of the damages, if any, represented compensation for future pain and suffering. *Boyle,* 893 F.2d at 718. In this case, the judgment does not state what proportion of the pain and suffering award is for future damages.[11] Because it appears to have included the award of prejudgment interest on damages for future pain and suffering, we must vacate this portion

---

[11]The district court described the pain and suffering award as compensation for "[p]hysical pain and suffering, disability, impairment, and mental anguish." The court's findings do not divide the pain and suffering award as between that in the past and that to be undergone in the future.

of the judgment and remand it to the district court for a determination of what proportion of the pain and suffering award represents future damages.

## Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED in part;  VACATED in part;  and REMANDED.