United States Court of Appeals
Fifth Circuit

**F I L E D**

August 11, 2003

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

01-30742

_____

CHARLES ALBRIGHT, III; ET AL.,

Plaintiffs,

MICHAEL GLASSER; STEPHEN DUNN; EARLE FRISARD,

Plaintiffs-Appellants,

versus

THE CITY OF NEW ORLEANS; ET AL.,

Defendants,

THE CITY OF NEW ORLEANS; MARC H. MORIAL, Individually
And In His Official Capacity As Mayor Of The City Of
New Orleans; RICHARD PENNINGTON, Individually And In
His Official Capacity As Superintendent Of Police For
The City Of New Orleans,

Defendants-Appellees.

_____

BARRY FLETCHER; ET AL.,

Plaintiffs,

BARRY FLETCHER; STEPHEN DUNN; MICHAEL GLASSER;
EARL J. FRISARD; BRUCE LITTLE,

Plaintiffs-Appellants,

versus

THE CITY OF NEW ORLEANS; ET AL.,

Defendants,

THE CITY OF NEW ORLEANS; RICHARD J. PENNINGTON,
Individually And In His Official Capacity As
Superintendent Of Police For The City Of New Orleans;

Defendants-Appellees.

_____

**Appeal from the United States District Court
for the Eastern District of Louisiana
(97-CV-2523)**

Before SMITH and BARKSDALE, Circuit Judges, and DUPLANTIER,

District Judge[1].

PER CURIAM:[2]

Several New Orleans police officers contest the judgment,

after a bench trial, dismissing their race discrimination claims.

Primarily at issue is whether the district court clearly erred in

finding the City offered proper reasons for requesting that its

Civil Service Commission not extend a promotional register.

**AFFIRMED.**

I.

The police department developed a promotional register for

prospective lieutenants which remained in effect from May 1994 to

November 1998. The register grouped promotion-candidates into six

bands, corresponding to their performance on an examination for

promotion to lieutenant, administered in 1992. The test had been

developed in 1991. This procedure was mandated by a 1987 consent

decree in *Williams v. City of New Orleans*, Civ. Action No. 73-629.

---

[1] District Judge for the Eastern District of Louisiana,
sitting by designation.

[2] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

The *Williams* decree required, together with the above-described bands, the creation of supernumerary positions to be filled only by black officers.  Those positions could be filled by black officers from lower bands than the one being used, if no black officers were in that band.  The consent decree also mandated that lieutenants were to make up 4.9 percent of the force, and that the decree would end upon the expiration of the second promotional register compiled under it.

The City's Civil Service Commission (CSC) was in charge of maintaining the register, which was to remain in effect for no less than one year.  The CSC's Director then had sole discretion to continue the register's use for another two years.  Any extension beyond that total three years was a decision for the CSC.

The second register compiled pursuant to the consent decree was established in May 1994.  In March 1995, all 16 officers in bands one through three were promoted to lieutenant, as well as six officers in band four, five of whom were that band's only black officers.  Twenty-six white officers remained in band four.  In order to fill available supernumerary positions, and because no black officers remained in band four, black officers in band five were promoted. Accordingly, aside from any supernumerary positions that might become available, any officer promoted thereafter to lieutenant under the register would have to be a white officer from band four.

3

By May 1997, three years had passed since the second register had been compiled. Thus, it was for the CSC to determine whether to extend its use. The CSC extended the register for three months — through August 1997. That August, the City, through Police Superintendent Pennington, requested that the CSC not further extend the register, noting: (1) the test from which the register was compiled "was based on performance and testing criteria formulated in late 1991"; (2) a new test, which would incorporate progressive policing tactics, was "essential in the identification of the future leadership of the department"; and (3) no need was foreseen to "promote additional Lieutenants in the immediate future".

In anticipation of that request, the plaintiffs in this action — five white New Orleans police sergeants in bands four and five (*Fletcher* plaintiffs) — sued and requested a temporary restraining order against the City's stating its preference to the CSC about the register's extension. Because the CSC extended the register for six months, the action was dismissed as moot.

That September, the City requested that the CSC reverse its six-month-extension decision, referencing the City's August letter and asking the CSC to "move expeditiously to administer a new test which would correctly reflect those dimensions [the Superintendent] ha[d] identified as critical in the leadership of th[e] department".

4

That October, the City again requested reconsideration of the CSC's register-extension decision. In so doing, Superintendent Pennington again referenced the age and ineffectiveness of the test:

> It is of great importance that the future leaders of the Department be chosen from those who demonstrate knowledge and abilities consistent with current policies, procedures and strategies. Testing candidates, emphasizing the vital dimensions of integrity, accountability, and community policing is essential in the identification of those future leaders.

Also that October, the City promoted two officers. One was a white band four sergeant; the other, a black band five sergeant (supernumerary position).

That November, the CSC decided to terminate the register, retroactive to August. The *Fletcher* plaintiffs again requested a temporary restraining order against the termination, claiming it violated 42 U.S.C. § 1983, LA. REV. STAT. § 23:1006 *et seq.* (unlawful for employer to discriminate on basis of race), and LA. REV. STAT. § 51:2231 *et seq.* ("safeguard[ing]" individuals from racial discrimination). (The complaint was later amended to, *inter alia*, claim the termination-request also violated Title VII of the Civil Rights Act, the Equal Protection Clause, and the *Williams* consent decree.) The *Fletcher* plaintiffs alleged: the City did not want to promote whites to lieutenant; and the City knew it would have to do so to comply with the consent decree unless the register was

5

terminated, thereby ending the decree. A TRO was granted, to remain in effect until the resolution of the *Fletcher* plaintiffs' action.

The *Fletcher* plaintiffs' action was consolidated with three others concerning the department's claimed discriminatory policies. In January 1999, on the basis of a time-bar, summary judgment was awarded the City against the *Fletcher* plaintiffs' discrimination claims. The *Fletcher* plaintiffs' claims based on asserted violations of the consent decree were tried to the bench and dismissed.

The plaintiffs in the consolidated actions, including the *Fletcher* plaintiffs, appealed. This court, *inter alia*, affirmed the dismissal of the *Fletcher* plaintiffs' consent decree claims, but reversed the time-bar ruling against their discrimination claims. *Albright v. City of New Orleans*, No. 99-30504 (5th Cir. 1 November 2000) (unpublished).

On remand, a bench trial was held. Pursuant to detailed findings of fact and conclusions of law, the district court dismissed the *Fletcher* plaintiffs' discrimination claims, finding the City had proper reasons for requesting the register's termination.

II.

The **Fletcher** plaintiffs challenge:  (1) the ruling that the City had proper reasons for requesting the termination; and (2) the exclusion of certain testimony.  (Although the decision adverse to the **Fletcher** plaintiffs was rendered in a consolidated case and no FED. R. CIV. P. 54(b) certification was entered, our court has jurisdiction because the consolidation was not "clearly unlimited" and the several actions could not have been brought as a single action.  *In re Transtexas Gas Corp. v. TransTexas Gas*, 303 F.3d 571, 577-78 (5th Cir. 2002) (quoting *Ringwald v. Harris*, 675 F.2d 768, 771 (5th Cir. 1982)).)

A.

Conclusions of law are reviewed *de novo*.  *E.g.*, *Randel v. United States Department of Navy*, 157 F.3d 392, 395 (5th Cir. 1998).  More relevant to this appeal, findings of fact are reviewed only for clear error.  *E.g., Couch v. Cro-Marine Transport, Inc.*, 44 F.3d 319, 327 (5th Cir. 1995).  A finding of fact is clearly erroneous when, on review of the record, we are left "with the definite and firm conviction that a mistake has been committed".  *Id*. (citation omitted).

The crux of this appeal is the claimed clear error in crediting Superintendent Pennington's testimony that he sought the register-termination because the test upon which the register was based was outdated and did not reflect the values the

7

Superintendent thought should be tested. Accordingly, primarily at issue are findings of facts based on witnesses' credibility. For such findings, Federal Rule of Civil Procedure 52(a) "demands even greater deference to the trial court[] ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said". *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). *See also*, *United States v. Bentley-Smith*, 2 F.3d 1368, 1377 (5th Cir. 1993).

In a Title VII race discrimination action, a plaintiff must present a *prima facie* case of discrimination. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The City does not contest the district court's conclusion that the *Fletcher* plaintiffs did so.

Once a *prima facie* case has been established, the defendant must present legitimate, non-discriminatory reasons for the employment action. *E.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). Along this line, the *Fletcher* plaintiffs do *not* contend the test's obsolescence could not be a legitimate, non-discriminatory reason for requesting the register's termination.

Finally, if the defendant presents such reasons, the burden shifts back to the plaintiff to show those reasons are pretextual. *E.g.*, *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000). It is on this point that the *Fletcher* plaintiffs claim the

8

district court clearly erred by crediting Superintendent Pennington's testimony.

The district court understood the City's termination-request to be based on two considerations: the need for a new test; and not needing new lieutenants. As for the latter, evidence showed that the department needed new lieutenants. For example, prior to Superintendent Pennington's writing the termination-request letters to the CSC, the Chief Administrative Officer had written to the Superintendent concerning 15 lieutenant vacancies. (At trial, Superintendent Pennington did not recall that letter.) As also noted, between the dates of the letters, two officers were promoted to lieutenant; Superintendent Pennington testified the promotions were made "because some people left [and the department] needed two more lieutenants".

The district court found: the evidence "significantly undermined [the City]'s assertion that they sought to terminate the [register] because NOPD did not need additional lieutenants in 1997"; and, Superintendent Pennington's October promotion of the two officers "preclude[d] a finding that he believed there was absolutely no need for additional lieutenants during the pertinent time period".

The **Fletcher** plaintiffs seek mileage from the district court's rejection of this part of the City's explanation. They cite the court's statement that the explanation's veracity was "impugn[ed]"

9

and claim Superintendent Pennington testified "untruthfully" about that explanation. Accordingly, plaintiffs contend, Superintendent Pennington's "overall credibility" was diminished, including as it related to other reasons for requesting the register-termination.

It is apparent from Superintendent Pennington's August, September, and October 1997 letters to the CSC, however, that the reason for the termination-request was the test's obsolescence, not the lack of need for new lieutenants. Indeed, only the August letter referenced that lack. Moreover, even in that letter, the reference served only to allay any fears the CSC might have had about terminating the register based on Superintendent Pennington's stated reason that the test upon which the register was based was too old. Along this line, it should also be noted that the "need" to promote the two lieutenants in October arose *after* Superintendent Pennington's three letters to the CSC and over two months after he wrote the only letter describing not needing new lieutenants. In fact, the district court observed: "[I]t is a disputed issue of fact as to whether ... [Superintendent] Pennington knew about the shortage of lieutenants and non-compliance [with the consent decree's 4.9 percent ratio requirement] when he sought to have the register expire". In sum, the district court's rejection of the City's no-new-lieutenants-needed contention sheds almost no light on the pretextual nature

10

*vel non* of the City's main explanation for the termination-request: the test's obsolescence.

As for this explanation, the district court held: "Plaintiffs have failed to carry their burden of showing that the proffered reason was false[,] much less a pretext for discrimination". The court noted that the test had been administered in 1992 and any officer who had not taken it would not be eligible for promotion. It ruled: "Given ... [Superintendent] Pennington's goal to effect change and improvement within [the police department], the [d]efendants' reluctance to allow the roster to run the full five years permitted under [CSC] regulations ... is hardly proof of a nefarious motive".

Primarily on the basis of three items of evidence, the *Fletcher* plaintiffs assert that the district court clearly erred in its ruling. First, Superintendent Pennington testified that he did not review the 1992 test to determine whether it tested for the progressive techniques he desired. Second, when Superintendent Pennington requested the register-termination, no new test was in place from which a new register could be created. Finally, in 1996, one *Fletcher* plaintiff, Sergeant Glasser, passed a captain's examination, which met Superintendent Pennington's criteria for testing progressive techniques. Yet Superintendent Pennington promoted a band five black officer to lieutenant in the October 1997 promotions, even though he had never taken such a test.

11

Superintendent Pennington's not having personally reviewed the 1992 test is not critical. He testified that the national standard was a two-year list. Superintendent Pennington became Superintendent in October 1994. It was reasonable for him to seek to impress his own values upon promotional registers and keep the department more current by using a new test in place of one developed six years, and administered five years, earlier. As he testified: "There was [sic] so many factors involved and I thought there would be a greater opportunity for the department to really get the *new* candidates for ... lieutenant *to prepare for an examination* based on [current policies, procedures, and strategies, such as accountability and community policing]". (Emphasis added.)

Along this line, although a new test had not been completed, the Superintendent could have reasonably wanted to avoid making any large-scale promotions on the basis of what he considered to be an outdated test. As a result, there being no new test from which to promote lieutenants does not show clear error. (Moreover, the record conflicts as to how long it would take to create and administer a new test. The City's Personnel Director testified that he told Superintendent Pennington it would take in the "ballpark" of six to nine months to have a new test, and it might take "up to nine months" to administer one.)

The **Fletcher** plaintiffs' contention that Superintendent Pennington disregarded the captain's test in making the October

1997 promotions also fails to show clear error. First, as the district court noted, Sergeant Glasser was one of "many individuals who comprised the candidates on the roster". More importantly, the black officer with whom plaintiffs contrast Sergeant Glasser was promoted to a supernumerary position.

In the light of our deferential standard of review, especially for credibility determinations made by the district court, we cannot say it committed clear error in crediting Superintendent Pennington's testimony that he had a legitimate, non-dicriminatory reason for seeking register-termination. Along this line, the October promotions of two sergeants to lieutenant strengthen, instead of diminish, Superintendent Pennington's credibility. One of those promoted was a white officer. Had Superintendent Pennington been motivated by racial animus to the point that he would disregard the department's need for lieutenants, he would hardly be expected to promote that officer. Moreover, and as noted by the district court, the CSC, an independent body, found convincing Superintendent Pennington's reason relating to the test's obsolescence. Finally, it, not the Superintendent or the City, made the ultimate register-termination decision.

B.

The **Fletcher** plaintiffs challenge the district court's not admitting part of Deputy Chief Hewlitt's testimony. The ruling is reviewed for abuse of discretion. *E.g.*, **Celestine v. Petroleos de**

13

*Venezuella SA*, 266 F.3d 343, 349 (5th Cir. 2001). Evidentiary rulings are also subject to harmless error analysis. *E.g.*, *Green v. Administrator of the Tulane Educational Fund*, 284 F.3d 642, 660 (5th Cir. 2002) (affirmed unless substantial right affected (citing *United States v. Asibor*, 109 F.3d 1023, 1032 (5th Cir.), *cert. denied*, 522 U.S. 902 (1997))). *See* FED. R. EVID. 103.

Deputy Chief Hewlitt testified that: Superintendent Pennington's deputies had encouraged the promotion of black band-four officers in order to maximize the benefit of the supernumerary positions; she voiced some objection regarding that process to the Superintendent; and she had spoken with the Superintendent immediately before a black band-four officer was promoted *in 1995*. The district court would not permit Deputy Chief Hewlitt, however, to testify about the content of that *1995* conversation, ruling it was irrelevant or, alternatively, unfairly prejudicial. A proffer was made of that conversation.

For her proffer, Deputy Chief Hewlitt testified: after the 1995 promotion of the black band-four officer, she spoke with the Superintendent to express concerns about that officer's disciplinary record; the 1995 promotion form would have indicated a candidate's race to the Superintendent; and the Superintendent "[w]ould have understood the concern about the race of those who were not being given fair consideration [in 1995]".

14

Assuming *arguendo* that the ruling was erroneous, it was harmless. First, the *Fletcher* plaintiffs' claims relating to the 1995 promotions were time-barred. Moreover, Deputy Chief Hewlitt testified that she did not mention the racial motivation of the deputies when she spoke with the Superintendent. Accordingly, Deputy Chief Hewlitt's testimony about her discussion with the Superintendent offers no basis to call into question the Superintendent's racial motivation *vel non in 1997* for requesting the register's termination.

At most, Deputy Chief Hewlitt's excluded testimony would raise an issue concerning Superintendent Pennington's credibility when he testified that he did not remember the conversation with the Deputy Chief about the 1995 promotions. As the district court noted during trial, however, that inconsistency was established by Deputy Chief Hewlitt's admitted testimony.

## III.

For the foregoing reasons, the judgment concerning the *Fletcher* plaintiffs is

**AFFIRMED.**

15