**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 00-31119

_____


PETER J. DAHLEN; et al.,

                                                  Plaintiffs,


PETER J. DAHLEN,

          Plaintiff - Appellant-Cross-Appellee,


VERSUS


GULF CREWS, INC.; GULF BOAT MARINE SERVICES, INC.;

          Defendants - Cross-Defendants-Appellees,


UNIVERSAL OGDEN SERVICES,

                              Defendant - Appellee,


FOREST OIL CORP.,

Defendant - Cross-Claimant - Third Party Plaintiff -
                         Appellee-Cross-Appellant,


VERSUS


SECURITY INSURANCE COMPANY OF HARTFORD,

               Third Party Defendant - Appellee.

Appeals from the United States District Court
For the Western District of Louisiana
February 4, 2002

Before JONES and DeMOSS, Circuit Judges, and LIMBAUGH,[1] District Judge.

DeMOSS, Circuit Judge:

On July 6, 1995, Peter Dahlen injured his back aboard an oil platform while unloading groceries from an eight-foot square metal grocery box.  The platform is owned and operated by Forest Oil Corporation ("Forest").  Dahlen sued Forest, as well as the grocery supplier, Universal Ogden Services ("Universal"), and the chartered ship owner, Gulf Crews, Inc. and Gulf Marine Services, Inc. ("collectively, "Gulf") for negligence.  The district court granted Universal's and Gulf's motions for summary judgment on the basis that they owed no duty to Dahlen.  At trial, a jury found that Forest was not negligent and Dahlen now appeals.  On appeal, Dahlen claims: (1) the jury charge was erroneous as to the legal standard of negligence it set forth; (2) the jury charge was erroneous as to the duty that was owed by Forest as the time charterer; (3) the jury's findings were erroneous; and (4) it was error to grant Universal's motion for summary judgment.

_____

[1]    District Judge of the Eastern District of Missouri, sitting by designation.

## BACKGROUND

Forest Oil Company is the owner and operator of several platforms producing oil and gas in the Gulf of Mexico, including, for the purposes of this suit, West Cameron 44, High Island 116 and High Island 820. All three of these artificial islands are located approximately one and a half hours by boat from each other and are on the Outer Continental Shelf adjacent to the State of Louisiana. In July 1995, the plaintiff, Peter Dahlen, was an employee of Island Operating, but was assigned to work for Forest on Forest's production platforms in the Gulf of Mexico. Dahlen was employed as a barge operator. At the time of his employment, Dahlen had no physical restrictions and was in good health.

Forest purchased groceries for their offshore platforms from Universal Ogden Services. On July 5, 1995, Forest made a grocery order for West Cameron 44, High Island 116 and High Island 820 from Universal. Universal transported the groceries by truck to a dock in Sabine Pass, Louisiana, and loaded them into an eight-foot square metal blue cube or "grocery box." The grocery box was loaded via crane by Grasso Production Management onto the M/V BILLY JAY, a supply boat owned by Gulf and time chartered by Forest, for transport offshore.

On July 6, 1995, Forest operator, Greg Sweet, instructed Dahlen to go by helicopter to the West Cameron 44 platform and

3

perform routine maintenance and take readings. Sweet also told Dahlen that the M/V BILLY JAY would be arriving with groceries and supplies, which Dahlen should unload. When the BILLY JAY arrived, Dahlen offloaded the grocery box using a crane. When Dahlen opened the box, he found that it had been loaded in such a manner that the supplies for West Cameron 44 were in the back of the box. Because the box only had a single door by which to access its contents, in order to unload the supplies for West Cameron 44, Dahlen had to take everything out of the box, set aside the supplies for his platform, and then reload the other platforms' supplies into the box. This whole process took approximately one hour.

Dahlen claims this activity caused him to suffer a back injury and he had to fly back to shore the next day due to the pain he was experiencing. He had extensive conservative treatment, which proved ineffective. Eventually, Dahlen had to undergo a posterior/anterior two-level lumbar fusion surgery, using hardware to stabilize his back. Dahlen claims that he has not worked since the incident, and that he continues to suffer from pain and depression and that his medications cost $509 per month.

On May 2, 1996, Dahlen filed suit for negligence in the 38th Judicial District Court, for the Parish of Cameron, State of Louisiana. Made defendants were: Gulf, Universal, and Forest. Dahlen maintained that it was negligent, on the part of the defendants, to load the groceries in the order that they did.

4

Dahlen asserted that there was a duty to load the groceries according to a "first in, last out" rule so that he would not have had to unload the groceries destined for the other platforms. On May 28, 1996, the defendants timely removed the action to federal court, invoking federal question jurisdiction via the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq.* All three defendants filed motions for summary judgment. Universal and Gulf were granted their motions on the grounds that they owed no legal duty to Dahlen. Forest was granted its motion for summary judgment as to liability as the platform owner because Dahlen did not premise his claim on platform liability, but rather on Forest's duty as the time charterer of the BILLY JAY. Forest's motion to dismiss the claim against it as time charterer was denied and the claim went to trial. A jury found that Forest was not negligent and Dahlen appealed. Forest also appealed a refusal by the court to grant Forest indemnity under the charter contract between it and Gulf.

## DISCUSSION

The district court's application of the Admiralty Extension Act

Forest contends that the district court erred in its finding that the Admiralty Extension Act applied, making maritime law also applicable. Forest is under the misconception, however, that this error would deprive the district court of jurisdiction. Forest

5

then goes on to state that the district court allowed liability premised on 33 U.S.C. § 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), which was grounded in admiralty jurisdiction. Forest therefore seems to argue that, had the district court not used the Admiralty Extension Act, the court would lack subject-matter jurisdiction. The plaintiff responds simply by endorsing the district court's application of the Extension Act.

Neither party nor the district court thought about determining whether jurisdiction could be premised in the OCSLA. The West Cameron 44 platform is a fixed production platform, or artificial island, located on the Outer Continental Shelf (OCS). As such, injuries that occur on the platform are subject to Federal jurisdiction. 43 U.S.C. §§ 1333(a)(1) and 1349(b).[2] The district court clearly found that the claim is governed by the OCSLA; the apparent confusion over jurisdiction seems to arise from the court's statement that "when an event occurs on an OCSLA situs, and

---

[2]     43 U.S.C. § 1349(b) states, in relevant part:

> [T]he district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf.... Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose.

6

maritime law is also applicable, then maritime law controls." What the parties fail to notice is that the court used the word "also" in referring to the applicability of maritime law and cited *Smith v. Penrod Drilling Corp.*, 960 F.2d 456, 459 (5th Cir. 1992). The district court was premising its decision on *Smith*, which relied, in part, on *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043 (5th Cir. 1990), to determine whether to apply state law or federal maritime law to an action pursuant to § 1333(a)(2)(A) of the OCSLA. *PLT* stated that:

> [F]or adjacent state law to apply as surrogate federal law under OCSLA, three conditions are significant. (1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law.

*Id.* at 1047. We assume the district court was focusing on the second prong of *PLT* when it decided that the Admiralty Extension Act was applicable and so maritime law applied of its own force. The decision to apply maritime law, however, has nothing to do with whether or not a federal court has jurisdiction. It clearly does. *See* § 1349(b).

Satisfied that the district court had subject-matter jurisdiction of this controversy and that the case was properly removed from state court, we turn to the issue raised by Forest of whether it was error to apply the Admiralty Extension Act to the

7

present case.  We review the district court's conclusions of law *de novo*.  **Dow Chem. Co. v. M/V Roberta Tabor**, 815 F.2d 1037, 1042 (5th Cir. 1987).  The district court found that maritime law controls the instant case by way of 46 U.S.C. § 740, The Admiralty Extension Act, which states, in relevant part:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

In reaching this conclusion, we think the district court erred.

In order to invoke maritime jurisdiction under the Extension Act, a plaintiff injured on shore must allege that the injury was caused by "a defective appurtenance of a ship on navigable waters." **Margin v. Sea-Land Services, Inc.**, 812 F.2d 973, 975 (5th Cir. 1987).  The district court relied on Supreme Court cases that have held that a defective cargo container is considered an appurtenance of a ship to hold that the grocery box was also an appurtenance. *See* **Victory Carriers, Inc. v. Law**, 404 U.S. 202, 210-211 (1971) (endorsing the concept that an appurtenance of a ship falls under the Extension Act); **Gutierrez v. Waterman Steamship Corp.**, 373 U.S. 206 (1963) (applying maritime law when a longshoreman was injured on a dock by defectively bagged beans).  The district court felt that Dahlen's injury was due to an allegedly improperly loaded and/or negligently transported cargo container and that this was

8

not significantly distinguishable from the loading of beans in inadequate containers as alleged in *Gutierrez*. We disagree.

In *Gutierrez*, the Supreme Court applied the Extension Act to provide compensation for a longshoreman who was injured on a dock by defective cargo containers being unloaded from a ship located on navigable waters. *Gutierrez*, 373 U.S. at 209-10. The Supreme Court warned, however, in *Victory Carriers, Inc. v. Law*, that when deciding to extend admiralty jurisdiction under the Act, the courts should act with caution. 404 U.S. at 212; *R.O. Bennett v. Faircape Steamship Corp.*, 524 F.2d 979, 981 (5th Cir. 1975). In *Victory*, the Court was faced with whether to extend admiralty jurisdiction to a man who was injured on the dock while operating a forklift machine to load cargo onto a ship. *Victory*, 404 U.S. at 203. The Court declined to extend admiralty jurisdiction, reasoning that state law traditionally governed accidents such as the one with which they were faced. *Id.* at 211-212. The *Victory* Court also specifically noted that *State Industrial Commission v. Nordenholt Corp.*, 259 U.S. 263 (1922), had not been overruled. *Victory*, 404 U.S. at 210. In *Nordenholt*, the Supreme Court held that compensation for a longshoreman, who was injured when he slipped on a dock while stacking bags of cement that had been unloaded from a ship, was governed by local law, not federal maritime law. *Nordenholt*, 259 U.S. at 275-76. Most recently, this Circuit interpreted the two Supreme Court decisions in *Victory* and

9

*Gutierrez* stating that the Extension Act is meant to apply to the vessel and her appurtenances "and does not include those performing actions for the vessel." ***Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancy***, 183 F.3d 453, 456 (5th Cir. 1999). This Circuit has also noted that, since the *Gutierrez* ruling, the LHWCA has been amended "to cover employees working on those areas of shore customarily used in loading, unloading, repairing, or building a vessel." ***R.O. Bennett***, 524 F.2d at 980.

At least three factors, therefore, mitigate against the application of *Gutierrez*. First, *Gutierrez* is factually distinguishable. *Gutierrez* involved a plaintiff who was injured when he slipped on some beans that spilled out of a *defective* bag *while* it was being unloaded (not after it had been placed on the dock). Also, at the time *Gutierrez* was decided, the LHWCA did not contain the provisions it does today extending coverage to activities of loading and unloading ships while on the the adjacent dock or pier. Second, no case cited by either party or the court deals with the use of the Extension Act in conjunction with the OCSLA, which has its own provisions concerning the application of state law. If the reasoning of *Victory* holds true, then state law concerns should mitigate against application of the Extension Act. Furthermore, the OCSLA specifically regards the artificial islands on the OCS as areas where state law should apply unless there is a conflict with federal law. *See **Rodrigue v. Aetna Cas. & Sur. Co.**,*

10

395 U.S. 352, 363 (1969) (stating that the application of maritime law is inapposite to fixed structures on the OCS). Third, the holding of this Circuit in *Egorov* makes it clear that for the Extension Act to apply, the defect must be in the appurtenance and not be due to the personnel performing services for the vessel. *Egorov*, 183 F.3d at 456. What is alleged in the present case is not a defect in the grocery box but in the manner in which groceries were loaded into the box. *Egorov* clearly indicates that the Extension Act should not apply to such a case. This Court, therefore, holds that the Admiralty Extension Act was improperly applied in the present case and that Louisiana state law, not federal maritime law, should have applied to this negligence action. As it turns out, however, whether Louisiana state substantive law is applied or not does not affect the outcome of the case.

The district court's instructions to the jury as to the applicable standard for negligence

This Court reviews challenges to jury instructions for abuse of discretion and will reverse a judgment "only if the charge as a whole creates a substantial doubt as to whether the jury has been properly guided in its deliberations." *C.P. Interests, Inc. v. California Pools, Inc.*, 238 F.3d 690, 700 (5th Cir. 2001) (quoting *FDIC v. Mijalis*, 15 F.3d 1314, 1318 (5th Cir. 1994) (internal

11

citation omitted)). However, even if the jury instructions were erroneous, "we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case." *Johnson v. Sawyer*, 120 F.3d 1307, 1315 (5th Cir. 1997). Under Rule 51 of the Federal Rules of Civil Procedure, "No party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." A failure to object, however, will not act as a jurisdictional bar to review and this court will entertain tardy objections to jury instructions under the plain error standard of review. *Tompkins v. Cyr*, 202 F.3d 770, 783 (5th Cir. 2000). "In reviewing jury instructions for plain error, we are exceedingly deferential to the trial court." *Id.* at 784.

Prior to the jury's deliberations, Dahlen requested the following jury charge, which was given by the court:

> A tortfeasor takes the victim as he finds him and is responsible in damages for consequences of his tort even though the damages are greater because of the victim's prior condition. When the defendant's negligent act aggravates a preexisting condition or injury, the victim is entitled to compensation for the full extent of the aggravation.

This charge was meant to inform the jury of the "eggshell skull" doctrine. After deliberations began, the jury asked the district judge to further define "an unreasonable risk of foreseeable

12

injury," which appeared in one of the jury issues or instructions regarding negligence. The district judge instructed the jury to refer to Section V (entitled applicable law), of the jury charge in its entirety. Dahlen contends that the district court should have given the jury further instructions, informing the jury that the defendants could be found negligent even if the injury that resulted was unforeseeable. Dahlen now appeals this failure as error. Dahlen admits that he did not object to the jury instructions as to this aspect prior to deliberations, but contends that this was only because it was not clear, until the jury questioned the charge, that further instructions were needed.

The "eggshell skull" doctrine requires a defendant to compensate a plaintiff for unforeseeable injuries flowing from some pre-existing physical condition. *Munn v. Algee*, 924 F.2d 568, 576 (5th Cir. 1991) (citing REST. 2D OF TORTS § 461 (1977)). Section 461 of the Restatement Second of Torts defines the doctrine more specifically as follows:

> The **negligent** actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct.

§ 461 (emphasis added). This definition, therefore, requires that the actor be negligent first, before the doctrine can come into play. This is supported by the heading under which § 461 is

listed, i.e., "Causal Relation Affecting the Extent of Liability But Not Its Existence."

As stated above, under *PLT*, once we have determined that the harm occurred on the OCS and that federal maritime law does not apply of its own force, we must still determine whether substantive state law is in conflict with existing federal law. *PLT*, 895 F.2d at 1047. A review of Louisiana case law reveals that § 461 of the Restatement Second is relied upon by their courts as well. *See Thames v. Zerangue*, 411 So. 2d 17, 19 (La. 1982) (holding that a tortfeasor is responsible for the consequences of his tort even if the damages are increased due to a pre-existing condition); *Reck v. Stevens*, 373 So. 2d 498, 502 (La. 1979) (quoting REST.2D OF TORTS 461); *Burnaman v. Risk Mgmt., Inc.*, 97-250 (quoting *Reck*, 373 So. 2d at 502). Louisiana courts have consistently held that "[w]hen the defendant's **tortious** conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation." *Lasha v. Olin Corp.*, 625 So. 2d 1002, 1006 (La. 1993) (emphasis added); *see also Aisole v. Dean*, 574 So. 2d 1248, 1253 (La. 1991); *Bush v. Arrow Int'l*, 94-373 (La. App. 3 Cir. 11/23/94), 646 So. 2d 1173, 1178 (La. Ct. App. 1994); *Thibodeaux v. Winn-Dixie of La., Inc.*, 608 So. 2d 673, 675 (La. Ct. App. 1992) ("Where a defendant's negligent action aggravates a preexisting injury or condition, he must compensate the victim for the full extent of the aggravation."). Therefore, Louisiana law

14

requires that a defendant be negligent before the "eggshell skull" doctrine can take effect and this is not in conflict with any federal law.

Appellant Dahlen would have this Court believe that the "eggshell skull" doctrine applies before liability is found, but even the cases cited in support of this contention actually go to damages and not liability. The rule, as applied to the present case, merely states that if a further unforeseeable injury occurs to a victim with a pre-existing condition due to a torteasor's **negligence**, that tortfeasor will still be held liable for the increased damages. ***Perniciaro v. Brinch***, 384 So. 2d 392, 396 (La. 1980) ("Where the defendant's negligent action aggravates a pre-existing injury, he must compensate the victim for the full extent of this aggravation."). The defendant must be negligent first, however. We therefore conclude that the district court's instructions to the jury were not erroneous.

The district court's instructions to the jury as to the duty owed by Forest

In addition to the above claim, Dahlen also contends that the district court erred in its instruction to the jury regarding the duty owed by a time charterer. The jury charge complained of states:

> The vessel charterer has the legal duty to exercise only reasonable care to have the vessel and cargo

15

> in such condition that the platform owner and its employees and workers would be able by the exercise of reasonable care to carry on the work of unloading the cargo with reasonable safety to persons and property.
>
> The charterer has no duty to supervise or inspect the loading or unloading of the cargo or to warn of open and obvious conditions.

Dahlen claims that this charge was based erroneously on *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981). Dahlen contends that the standard that should apply was enunciated in *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512 (5th Cir. 1996). Forest contends that *Scindia* and *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92 (1994) enunciate the appropriate standard because *Hodgen* only applies when a vessel charterer sends a boat into perilous weather conditions. In the alternative, Forest argues that the district court's instruction is harmonious with the *Hodgen* court's standard.[3]

*Hodgen* states that "a time charterer owes a hybrid duty arising from tort law to exercise the control the charter affords it[4] over the timing, route, and cargo of a vessel's journey in a

---

[3] There is no need to examine separately Louisiana law as Louisiana courts' have relied on Fifth Circuit precedent to determine the liability of a time charterer. *Wall v. Progressive Barge Line, Inc.*, 97-0665 (La.App. 4 Cir. 10/29/97), 703 So.2d 681, 685-688 (La.App. 1997) (finding that federal substantive maritime law often applies to such issues).

[4] The charter agreement states, in relevant part:

The vessel shall prosecute its trips and perform

16

reasonably prudent manner." ***Hodgen***, 87 F.3d at 1517. Dahlen

relies on this statement in his contention that this imposes a duty

on the time charterer to order that the groceries be loaded into

the box in accordance with the "first in-last out" principle. The

***Hodgen*** court went on to state the duty owed in more specificity

later on in the opinion, stating that case law "establish[es] that

the traditional spheres of activity in which a time charterer

exercises control and thus owes a duty include choosing a vessel's

cargo, route, and general mission, as well as the specific time in

which the vessel will perform its assignment." ***Id.*** at 1520.

***Hodgen***, and the cases it relied on, however, all involved

situations where a plaintiff was hurt while transferring from a

vessel to a platform, or vice versa, and almost always involved

perilous weather conditions or rough seas. Dahlen wishes to extend

the reasoning of ***Hodgen*** to a set of circumstances wholly unforeseen

by the ***Hodgen*** court. We are unwilling to do so in the present

situation.[5]

---

> its services as requested by CHARTERER, but sole
> responsibility for management, navigation and
> operation of the vessel (and all decisions as to
> whether the vessel can operate safely in various
> sea and weather conditions) shall remain at all
> times with the OWNER, same as when trading for the
> OWNER's account.

[5] Even if we accept Dahlen's contention that *Hodgen* should apply, the standard charged by the court in the present case does not vary significantly from the standard stated in *Hodgen* and certainly doesn't rise to the level of demonstrating that "the charge as a whole create[ed] substantial and eradicable doubt" that

17

Though we do not accept Dahlen's contention that *Hodgen* applies, we also note that the standard articulated in *Scindia* and *Howlett* does not explicitly apply to time-charterers. *Kerr-McGee Corp. v. MA-JU Marine Servs., Inc.*, 830 F.2d 1332, 1340 n.8 (5th Cir. 1987) (suggesting that the duties prescribed in *Scindia* only apply to true owners or other parties with similar dominion over the boat); *but see Woods v. Sammisa Co.*, 873 F.2d 842, 847 n.6 (5th Cir. 1989) (recognizing *Kerr-McGee* but applying *Scindia* nonetheless because the time-charterer may have similar duties under the time-charter agreement and the time-charterer before the Court assessed its own liability under the *Scindia* standard). *Howlett*, a case based on the reasoning in *Scindia*, involved the duty owed by a shipowner to a longshoreman who was injured while discharging bags of cocoa beans from the cargo hold of a vessel. *Howlett*, 512 U.S. at 94. The Supreme Court in *Howlett* stated that a vessel's duty to warn of latent defects in the cargo stow and area is a narrow one, and that the duty only attaches to "hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work." *Id.* at 105. The Court also stated that the duty would only

---

the jury had been properly guided in its deliberations as the standard of review requires. *Johnson*, 120 F.3d at 1315. The *Hodgen* standard includes a duty in choosing the cargo, but not in how groceries should be loaded into a box that will become cargo. Therefore the district court's charge was not erroneous even under *Hodgen*.

18

encompass hazards that are known, or should be known to the vessel through the exercise of reasonable care. *Id.* (citing *Scindia Steam*, 451 U.S. at 167). Under the standard enunciated in *Howlett*, the jury instructions would not be erroneous. Though *Howlett* deals with the relationship between a longshoreman and a vessel owner, the circumstances involved in *Howlett* are more akin to the present situation than the circumstances involved in *Hodgen*.[6] As we can find no other case articulating the duty owed by a time-charterer in such a situation, we hold that the district court did not abuse its discretion by issuing the jury instructions that it did, and that the instructions given by the district court did not create a substantial doubt as to whether the jury was properly guided in its deliberations as required by the standard of review.

The jury's findings

Dahlen further alleges that the jury and district court erred in finding no liability on the part of Forest in its capacity as time charterer, and that the district court improperly denied his motion for a new trial. This Court grants great deference to a jury's verdict and will reverse only if, when viewing the evidence in the light most favorable to the verdict, the evidence points so

---

[6] We do not intend, however, to indicate that Dahlen is a longshoreman or stevedore or that Forest is the vessel owner. We only hold that the situation involved is more compatible with the duty enunciated in *Howlett.*

19

strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion. *Baltazor v. Holmes*, 162 F.3d 368, 373 (5th Cir. 1998). A motion for a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence. *Carter v. Fenner*, 136 F.3d 1000, 1010 (5th Cir. 1998).

Dahlen contends that the jury could not have found against him because the evidence clearly established a duty to load the groceries in a "first in-last out" manner or to direct the route in accordance with how the groceries were loaded. Many of Dahlen's arguments simply rely on the fact that the jury instructions were erroneous and ignores the many factors that come into play when a jury is deliberating over the existence of negligence, such as proximate cause. Dahlen's conclusory allegations do not overcome the extremely high burden placed on him and so the jury's findings are affirmed. *See Vadie v. Mississippi State Univ.*, 218 F.3d 365, 372 (5th Cir. 2000) (quoting FED.R.CIV.P. 50(a)(1), stating that "[a] jury verdict must be upheld unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find' as it did.").

The district court's granting of Universal's motion for summary judgment

20

Dahlen's final issue on appeal is that the district court erred in granting Universal's motion for summary judgment. The district court granted Universal's second motion after initially denying a first motion for summary judgment. In granting the motion, the district court cited to *Chavez v. Noble Drilling Corp.*, 567 F.2d 287 (5th Cir. 1978), to support its conclusion that Universal owed no duty.

This Court reviews a grant of summary judgment in the trial court *de novo*, applying the same standard used by the trial court in ruling on the motion under Rule 56 of the Federal Rules of Civil Procedure. *Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996). Dahlen contends that the district court erred in applying *Chavez* in the manner it did and, in the alternative, that it should have applied *Couch v. Cro-Marine Transport, Inc.*, 44 F.3d 319 (5th Cir. 1995). Universal contends that the district court was correct in its application of *Chavez* and that it also owes no duty under Louisiana law. We find the *Chavez* opinion to be controlling.

In *Chavez*, the plaintiff, Anthony Chavez, suffered a back injury on an oil platform located on the OCS. Chavez injured his back when he lifted an unlabeled box of groceries weighing over one hundred pounds. *Chavez*, 567 F.2d at 288. Chavez sued the platform owner for failing to provide him with assistance and the grocery supplier for failing to label the box as to weight. *Id.* The

grocer was granted its motion for summary judgment and Chavez appealed. This Court stated that it was faced with choosing between Louisiana law and federal maritime law as to what standard of negligence to apply. *Id.* The court stated that under the Louisiana law, the courts were to apply a "duty/risk" analysis to determine whether a defendant's conduct was the legal cause of the plaintiff's injury. *Id.* (citing *Hill v. Lundin & Assoc., Inc.*, 256 So.2d 620 (La. 1972). Under this analysis, the court decided that the grocer owed no duty to Chavez to label the boxes as to weight, stating that the only duty owed was to properly pack the groceries. *Id.* at 289. The court did not end its analysis there, however, as it went on to determine whether the grocer would have been negligent under federal maritime law. The court noted that in federal maritime law, the courts have adopted the Restatement Second of Torts approach of "legal cause." *Id.* at 289. The court thus concluded that this standard involves a concept of duty or a legally-protected interest. *Id.* Having already found no duty to exist, the court therefore found that the grocer was not negligent under either standard.

Dahlen contends that because the *Chavez* court stated that there was a duty to properly pack the groceries, the district court should have found that there was a similar duty to pack them in the order of the deliveries. This is an incorrect application of the "duty/risk" analysis, however, which avoids the realities of the

22

situation and imposes artificial and unrealistic standards. *Chavez*, 567 F.2d at 289. The record does not establish that Universal had any affirmative duty to find out what order the deliveries were to be made in. Also, the record fails to establish that the "first in-last out" rule that Dahlen cites to is anything more than a rule of convenience rather than one of safety. As the district court pointed out, any duty that would be owed did not encompass the harm in this situation. Summary judgment was therefore properly granted to Universal.[7]

## The district court's dismissal of Forest's cross-claim for indemnity

The final issue on appeal is a cross-appeal brought by Forest arguing that it was error for the district court to deny its indemnity claim. The interpretation of indemnity clauses is a matter of law that is reviewable *de novo* on appeal. *Smith v. Tenneco Oil Co.*, 803 F.2d 1386, 1388 (5th Cir. 1986) (citing *Kemp*

---

[7]     Even under the language that Dahlen contends should control in this case, i.e., the *Couch* standard, no duty is owed by Universal. In *Couch*, the court stated:

> We hold that a loading stevedore must load the cargo so that an expert and experienced stevedore will be able to discharge the cargo with reasonable safety by exercising reasonable care.

*Couch*, 44 F.3d at 327. Even if this standard is used, Universal met its duty. Nothing in the record indicates that the way the groceries were loaded made it so that an experienced stevedore could not unload the cargo with reasonable safety.

23

*v. Gulf Oil Corp.*, 745 F.2d 921, 924 (5th Cir. 1984)).  District court interpretations of insurance policies are also reviewed *de novo*.  *Harbor Ins. Co. v. Urban Constr. Co.*, 990 F.2d 195, 199 (5th Cir. 1993).

Security contends that in order for Forest to prevail, it must overcome two obstacles.  First, Forest must prove that the injury to Dahlen arose out of or was related to the performance of the vessel charter.  Second, Forest must prove that Dahlen, already deemed a borrowed servant of Forest, was not a Forest employee for the purposes of the insurance clause in the vessel time charter.  Forest contends that because it was sued in its capacity as the time charterer of the vessel, they are entitled to coverage under the Gulf charter agreement.  Forest also contends that, though it was found to be the borrowing employer for the purposes of liability to Dahlen, it is not his employer under the insurance policy, citing *Johnson v. Amoco Prod. Co.*, 5 F.3d 949 (5th Cir. 1993) and *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238 (5th Cir. 1988) as support.

Security's first argument that Forest cannot claim indemnity because the injury did not relate to the performance of the vessel is correct.  Gulf's charter agreement states, in clear and unambiguous language, that indemnification under Gulf's insurance policy is triggered when an injury arises out of or is related to

24

the performance of the vessel during the charter.  The agreement states, in part:

> Owner agrees to indemnify, defend and save harmless Forest Group . . . from and against any and all claims, demands, judgments, defense costs, or suits . . . by any vessel, entity or person (other than the employees of the CHARTERER) in any way arising out of or related to the performance of this contract . . ..

The district court found that the present case did not arise out of or relate to the performance of the vessel during the charter and that Forest, therefore, had no claim.  We agree.  The present injury in no way related to the performance of the charter contract.  The grocery box was not loaded by Gulf but rather by Universal.  The box was not put on board the BILLY JAY by Gulf but was loaded via a crane located at the Sabine Pass dock by a third party, Grasso Production Management.  Also, the box was not unloaded from the BILLY JAY by Gulf but rather by Dahlen himself using a crane located on the Forest platform.  Dahlen never boarded the BILLY JAY and no crew members of the BILLY JAY ever went on the platform to assist Dahlen in taking the groceries out of the grocery box.  Therefore, under the terms of the charter agreement itself, Forest is not entitled to indemnification.

Security's second argument equally justifies a finding in its favor.  The insurance policy states, in relevant part:

> The Assurer hereby undertakes to make good to the Assured [Forest] . . . all such loss and/or damage and/or expense as the Assured shall as owners of the vessel named herein have become liable to pay

25

> and shall pay on account of the liabilities, risks, events and/or happenings herein set forth:
>
> (1) Liability for loss of life of, or personal injury to . . . any person, excluding however, unless otherwise agreed by endorsement hereon, liability under any Compensation Act to any employee of the Assured.

As Forest is being sued under the LHWCA, the only question becomes whether Dahlen was its employee for purposes of the indemnity provision.[8]  Forest tries to distinguish the finding that it is Dahlen's borrowing employer on the grounds that *Johnson* and *Melancon* both allowed the platform owner to be considered the borrowing employee for the purposes of the LHWCA but not for the purposes of indemnity between the borrower and the borrowee, i.e., the entity that lent the employee to Forest.  As Security points out, however, Forest is not seeking indemnity from the company that it borrowed Dahlen from (in this case Island), but is instead seeking indemnity from a third party that for all accounts is unrelated in any way to Dahlen.[9]  The reasoning of the district court that Forest was the borrowing employer should therefore be upheld.

---

[8]    As stated above, the charter agreement also contains a similar provision providing indemnity to any employee other than employees of the charterer.

[9]    Dahlen was never employed by Gulf and was never even aboard a ship at any time during the relevant events.  He unloaded the grocery box with a crane and was not injured until the box was on the platform.

## CONCLUSION

Having heard the oral arguments of the parties, and having carefully reviewed the record of this case and the parties' respective briefs and for the reasons set forth above, we conclude that the district court's jury instructions were not erroneous and that the jury's verdict should remain undisturbed. We also conclude that the district court did not err in granting Universal's motion for summary judgment or in dismissing Forest's cross-claim for indemnity. We therefore AFFIRM the district court's decision.

**AFFIRMED.**