United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 17, 2003**

Charles R. Fulbruge III
Clerk

REVISED JANUARY 9, 2004
**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 01-10815

---

UNITED STATES OF AMERICA, on behalf of
Small Business Administration,

Plaintiff-Appellee,

VERSUS

COMMERCIAL TECHNOLOGY, INC., ET AL.,

Defendants,

COMMERCIAL TECHNOLOGY, INC.,

Defendant-Appellant.

---

Appeal from the United States District Court
For the Northern District of Texas, Dallas

---

Before DeMOSS, DENNIS, and PRADO, Circuit Judges.

DeMOSS, Circuit Judge:

Commercial Technology, Inc. ("CTI") was found by a jury to have violated the Texas Uniform Fraudulent Transfer Act ("TUFTA") when it transferred real property to Electric & Gas Technology, Inc. ("EG&T"), a related entity. On appeal, CTI claims that there was insufficient evidence supporting the jury's findings that CTI violated TUFTA, that the district court erred in its admission of Fed. R. Evid. 404(b) evidence, and that the district court erred in denying CTI's motion for judgment as a matter of law on its statute

of limitations claim.

**BACKGROUND & PROCEDURAL HISTORY**

In 1985, Caddo Capital Corporation ("Caddo") loaned CTI $150,000. Caddo was a Small Business Investment Company licensed by the Small Business Administration ("SBA"). Caddo loaned the funds to CTI under the Small Business Investment Act, a federal program designed to increase the availability of capital to small businesses by channeling federal funds to such companies.

In December 1986, Caddo sued CTI in state court after CTI defaulted on its payment obligations under the promissory note. On June 21, 1988, Caddo obtained a final judgment against CTI for $105,000, plus interest, attorney's fees, and court costs. On June 28, 1988, the Dallas County Clerk's Office issued, filed, and recorded an abstract of judgment against CTI in favor of Caddo. Almost three years later, on May 30, 1991, Caddo assigned all of its rights in the judgment to the United States (the "government"), on behalf of the SBA.

In 1997, approximately one year before the judgment originally obtained by Caddo was to become dormant under Texas property law, the government retained the services of a company to identify potential assets of CTI.[1] The government contractor made contact

---

[1] Section 34.001(a) of the Texas Civil Practice and Remedies Code provides that a judgment is dormant if a writ of execution is not issued within ten years after the rendition of the judgment. If the writ is issued after the ten-year period, the judgment becomes dormant and execution may not be issued unless it is revived. Id. In the instant case, the judgment against CTI was

with Mort Zimmerman, the President of CTI, by letter in April and May 1997. Neither CTI nor Zimmerman responded to either of the government's letters.[2] Between June 1997 and May 1998, the government continued its investigation into the existence of CTI's assets. A title search in Dallas County revealed one piece of real property in CTI's name—an office building located at 13636 Neutron Road in Dallas, Texas (the "Neutron Road Property"). Ownership by CTI was confirmed by an examination of the public records for the Dallas County Appraisal District and the Farmers Branch property records.

On May 22, 1998, the government obtained a writ of execution on the Neutron Road Property; however, attempts at levying the writ proved unsuccessful. The government thereafter sought to renew the Caddo abstract of judgment. On June 23, 1998, the government recorded a new abstract of judgment (the "First Government Abstract") against CTI for the amounts due it under the assignment from Caddo. The First Government Abstract was later replaced by a corrected abstract of judgment (the "Corrected Abstract"), which was issued on July 28, 1998, and recorded with the Dallas County

---

rendered on June 28, 1988, establishing June 28, 1998, as the ten-year deadline by which the government was required to obtain a writ of execution.

[2] On June 9, 1997, Zimmerman caused CTI to execute a security agreement pledging the Neutron Road Property as collateral on a personal loan to Zimmerman in the amount of $140,000 by First Texas Bank.

Clerk's Office on August 4, 1998.[3]

In November 1999, the government sought to enforce its judgment against CTI through the judicial sale of the Neutron Road Property. However, CTI contested the sale, alleging that it only owned the Neutron Road Property until May 13, 1987. The events that are alleged to have transpired on May 13, 1987, bear great weight on this case, and therefore a detailed summary account of these alleged actions is necessary.

CTI claims that on May 13, 1987, while the suit brought against it by Caddo was pending, CTI transferred the Neutron Road Property to one of its subsidiaries, E&GT. The Neutron Road Property had originally been part of the security for a 1983 commercial loan between CTI and Allied American Bank for which CTI executed a note secured by deed of trust in favor of Allied American Bank. By May 1987, a number of other liens had attached to the Neutron Road Property as well. On May 13, 1987, Allied American Bank transferred the deed of trust and lien to First Texas Bank, for which Allied American Bank was paid $617,667.67.

Also on May 13, 1987, CTI executed a new deed of trust on the Neutron Road Property in favor of First Texas Bank for an obligation owed by E&GT to First Texas Bank in the principal amount of $617,667.67. CTI also executed a hypothecation agreement

---

[3] The First Government Abstract was inadequate because it failed to include the amount of the judgment as required by statute. TEX. PROP. CODE § 52.003(a)(6).

("Hypothecation Agreement") dated May 13, 1987, by which CTI agreed to allow the Neutron Road Property to be pledged as security for future loans from First Texas Bank to E&GT. The deed of trust and Hypothecation Agreement were recorded in the Dallas County Clerk's Office on May 18, 1987, and the transfer of lien was recorded on June 5, 1987.

However, it was not until November 24, 1998——more than eleven years after the deed of trust, Hypothecation Agreement, and transfer of lien were executed and recorded——that CTI recorded a warranty deed and purchase agreement (both dated May 13, 1987), which purported to show that the Neutron Road Property had been sold by CTI to E&GT on May 13, 1987. CTI argued that the original warranty deed and purchase agreement had been lost by the title company, which CTI claimed had gone bankrupt and thus had failed to record the instruments.

Notwithstanding CTI's contention that it no longer owned the Neutron Road Property, the government filed a complaint in district court in November 1999, seeking a judicial sale of the Neutron Road Property to satisfy its judgment against CTI pursuant to the Federal Debt Collections Procedure Act ("FDCPA"), 28 U.S.C. § 3001 et seq. After the district court entered an order denying the government's initial application for enforcement of judgment and sale of real property,[4] the government amended its complaint in

_____

[4] The magistrate determined that the government was not entitled to relief under the FDPCA because the original promissory

5

August 2000, adding a claim against CTI under TUFTA, TEX. BUS. & COMM. CODE § 24.001 et seq. The essence of the government's TUFTA claim was its challenge of the purported May 13, 1987, transfer of the Neutron Road Property from CTI to E&GT.

In 2001, the TUFTA case was tried to a jury, which found that CTI had violated the Act by fraudulently transferring the Neutron Road Property to E&GT. Specifically, the jury determined that E&GT did not take the property in good faith nor for reasonably equivalent value. CTI now timely appeals.

**STANDARD OF REVIEW**

We review de novo a district court's ruling on a motion for judgment as a matter of law. Mississippi Chem. Corp. v. Dresser-Rand Co., 287 F.3d 359, 365 (5th Cir. 2002). However, when an action is tried by a jury, such a motion is a challenge to the legal sufficiency of the evidence supporting the jury's verdict. Brown v. Bryan County, OK, 219 F.3d 450, 456 (5th Cir. 2000)(citation omitted). Accordingly, we consider the evidence, "drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." Id. "This Court grants great deference to a jury's verdict and will reverse only if, when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and

---

note between Caddo and CTI was not a "debt" owing to the United States as defined by the federal statute because Caddo was not an instrumentality of the government. See 28 U.S.C. § 3002(3)(A).

6

overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." Dahlen v. Gulf Crews, Inc., 281 F.3d 487, 497 (5th Cir. 2002).

We review a district court's evidentiary rulings for abuse of discretion. United States v. Sanders, 343 F.3d 511, 517 (5th Cir. 2003). If we find an abuse of discretion, we review the error under the harmless error doctrine. Id.

## DISCUSSION

**I.   Whether there was sufficient evidence to support a jury finding that CTI transferred the Neutron Road Property to E&GT in violation of TUFTA.**

On appeal, CTI argues that it did not violate TUFTA because: (1) the transfer of the Neutron Road Property occurred on May 13, 1987; and (2) E&GT paid value for the property.

**A.   When the Neutron Road Property was "transferred" for purposes of TUFTA.**

CTI offers two theories to support its contention that the transfer of the Neutron Road Property occurred on May 13, 1987. First, it insists that the Hypothecation Agreement executed on May 13, 1987, was sufficient to convey title to the Neutron Road Property from CTI to E&GT. In the alternative, CTI insists that the copies of the warranty deed and the purchase agreement it recorded on November 24, 1998, were previously executed on May 13, 1987, and that the 1987 date should control. In response, the government points to numerous CTI corporate documents that appear to not only contradict relevant bank documents, but also the

7

testimony of CTI's own witnesses.

### 1.   The Hypothecation Agreement

In order to determine whether there was a conveyance of the Neutron Road Property from CTI to E&GT on May 13, 1987, we must first establish the legal effect of the Hypothecation Agreement. In the Hypothecation Agreement, CTI pledged the Neutron Road Property as collateral so that First Texas Bank would extend credit to E&GT.  The Hypothecation Agreement stated in pertinent part:

> [F]or the purpose of enabling [E&GT] to obtain credit therefor, . . . [CTI hereby certifies that] <u>the said property has been duly assigned, released, transferred, and delivered by [CTI] to [E&GT], and by these presents [CTI] hereby assign[s], release[s], and transfer[s] unto [E&GT] all of [CTI's] right, title, and interest in and to said property,</u> and hereby expressly authorize[s] [E&GT] to pledge or hypothecate all or any part of said property for the indebtedness aforesaid, and all renewals and extensions thereof, and also for any and all other indebtedness of the same borrower to you . . . .

(Emphasis added).

The Texas Property Code provides that "[a]n instrument that is properly recorded in the proper county is ... notice to all persons of the existence of the instrument." TEX. PROP. CODE § 13.002(1); <u>see also</u> <u>Resolution Trust Corp. v. Kemp</u>, 951 F.2d 657, 661 (5th Cir. 1992).  Texas law extends this principle further, recognizing that "an instrument properly recorded is notice, not only of facts therein expressly set forth, but also of all other material facts which an inquiry thereby reasonably suggested would have disclosed." <u>Housman v. Horn</u>, 157 S.W. 1172, 1173 (Tex. Civ. App.

8

1913) (citation omitted); see also Westland Oil Dev. Corp. v. Gulf Oil Corp., 637 S.W.2d 903, 908 (Tex. 1982) ("It is well settled that a purchaser is bound by every recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims.") (internal quotations and citations omitted); Lang v. City of Nacogdoches, 942 S.W.2d 752, 758 (Tex. App.—Tyler 1997, writ denied) ("[A] person is charged with constructive notice of the actual knowledge that could have been acquired by examining public records, and that constructive notice in law creates an irrebuttable presumption of actual notice.").

CTI contends that the government should be charged, as a matter of law, with constructive knowledge of the contents of the Hypothecation Agreement and with all other facts that a follow-up inquiry would have revealed. Matter of Estate of Matejek, 928 S.W.2d 742, 744 (Tex. App.—Corpus Christi 1996, writ denied); see also Resolution Trust Corp., 951 F.2d at 660-61. The government's response has two elements. First, it argues that the Hypothecation Agreement simply did not function to transfer title. The government relies on the general principle that a hypothecation agreement is a pledge, i.e., an encumbrance rather than a deed translative of title or ownership. Second, the government contends that whether the Hypothecation Agreement gave constructive notice of the transfer is an issue of fact, not law.

As a general matter, the government is correct in its

assertion that to hypothecate is "to pledge (property) as security or collateral for a debt, without delivery of title or possession." BLACK'S LAW DICTIONARY 747 (7th ed. 1999) (alteration in original). However, whether a hypothecation necessarily involves delivering title or possession does not appear to address the fact that even a pledge could fall under TUFTA's definition of "transfer." TUFTA defines "transfer" broadly to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien <u>or other encumbrance</u>." TEX. BUS. & COMM. CODE § 24.002(12) (emphasis added). Even if the Hypothecation Agreement could not transfer title to the Neutron Road Property, the encumbrance created by the Hypothecation Agreement may well have been a "transfer" under TUFTA.

However, before we address whether a hypothecation is a "transfer" under TUFTA, we must first determine the true meaning and scope of the Hypothecation Agreement at issue here. In construing a contract under Texas law, courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless. <u>Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines</u>, 278 F.3d 494, 497 (5th Cir. 2002). There are two steps to an ambiguity analysis of a contract. <u>Flagship Hotel, Ltd. v. City of Galveston</u>, 117 S.W.3d 552, 561 (Tex. App.—Texarkana 2003, writ denied). First, a court applies the

10

applicable rules of construction and decides if the contract is ambiguous. Id. If the court finds the contract is ambiguous, the trier of fact considers the parties' interpretation and other extraneous evidence. Id.

CTI certified in the Hypothecation Agreement that the Neutron Road Property was "duly assigned, released, transferred, and delivered" by CTI to E&GT, adding that CTI assigned, released, and transferred to E&GT "all of [CTI's] right, title, and interest in and to said property." On its face, this portion of the instrument appears to fully contemplate an absolute transfer of the Neutron Road Property from CTI to E&GT. However, when read with the provision immediately following the above statement, this conclusion is called into doubt. The next provision of the Hypothecation Agreement states that CTI "hereby expressly authorize[s] [E&GT] to pledge or hypothecate all or any part of said property for the indebtedness aforesaid." If CTI had truly transferred the Neutron Road Property to E&GT outright, then CTI's express authorization to E&GT to pledge or hypothecate the Neutron Road Property as collateral for future loans would certainly be unnecessary. It seems odd to transfer "all right, title, and interest" in real property to someone and at the same time expressly authorize that person to do certain things with the property after the transfer has been effectuated. In addition, the Hypothecation Agreement provides that E&GT may pledge the Neutron Road Property as collateral for any and all indebtedness it seeks

11

to create "at any time before this authorization shall have been revoked in writing." CTI's retention of a power to revoke further indicates that the Hypothecation Agreement was not intended to be an outright conveyance of the Neutron Road Property.

Although CTI contends that the Hypothecation Agreement served to transfer the Neutron Road Property to E&GT, a simple reading of the instrument reveals that it is susceptible to more than one interpretation. As such, an ambiguity exists as to the meaning and scope of the Hypothecation Agreement. Therefore, to determine the legal effect of the instrument, it becomes necessary to look at the intent and conduct of the parties.

As noted previously, CTI argues that it sold the Neutron Road Property to E&GT on May 13, 1987. However, it was not until November 23, 1998, that the corresponding warranty deed and purchase agreement reflecting this transfer were recorded in the Dallas County Clerk's Office. Substantial evidence shows that, in these intervening eleven years, CTI held itself out as the owner of the Neutron Road Property. For instance, government tax records show CTI as the owner of the Neutron Road Property as late as December 1998. Specifically, during the period from 1987 to 1998, both the Dallas County Appraisal District and the Dallas County Tax Collector issued property tax statements to CTI as owner of the Neutron Road Property. In addition, on November 24, 1993, CTI, through Zimmerman, executed a deed of trust, security agreement, an assignment of rent, and a financing statement involving the Neutron

12

Road Property to secure the indebtedness and obligations therein to CIT Group/Credit Finance, Inc., another creditor. This deed of trust was filed of record with the Dallas County Clerk's Office on December 7, 1993. Moreover, on April 23, 1997, CTI, through Zimmerman, executed a deed of trust to secure a promissory note payable to First Texas Bank. This deed of trust was filed of record with the Dallas County Clerk's Office on June 5, 1997.

Based on the terms of the Hypothecation Agreement and the conduct of CTI and E&GT after executing the agreement, we interpret the Hypothecation Agreement as simply being a pledge from CTI to E&GT as collateral for obtaining future loans and not as an instrument conveying title to E&GT.

### 2. Warranty Deed and Purchase Agreement

In the alternative, CTI claims that although the warranty deed and purchase agreement were recorded in November 1998, both instruments were actually executed on May 13, 1987. Therefore, CTI argues that title to the Neutron Road Property was passed from CTI to E&GT on the date of execution, not the date of recordation.

At trial CTI was unable to satisfactorily explain to the jury why it had two different, but executed, versions of each document dated May 13, 1987. Examination of the two copies of the warranty deed and the two copies of the purchase agreement reveal that the signatures and text alignment are different. In addition, the notary blocks bear different and inconsistent dates for expiration,

13

and one version of the notary block is handwritten whereas the other is typed. CTI also failed to explain how the title company it claimed had gone bankrupt managed to properly file and record the deed of trust, transfer of lien, and Hypothecation Agreement, but failed to file and record the warranty deed and purchase agreement when all five instruments were allegedly executed simultaneously on May 13, 1987.

CTI fails to direct this Court to any compelling evidence indicating that E&GT has been the owner of the Neutron Road Property since May 1987, or conversely, that CTI was not the owner of the property from 1987 to 1998. Therefore, we conclude that evidence clearly shows that CTI was the owner of the Neutron Road Property until at least November 23, 1998.

## B.    Reasonably Equivalent Value

In its second argument, CTI contends that E&GT paid reasonably equivalent value for the Neutron Road Property. However, CTI fails to articulate specific reasons to overturn the jury's verdict. Additionally, we have already determined that the actual transfer at issue occurred in November 1998 when CTI recorded the warranty deed and purchase agreement in the Dallas County Clerk's Office. There has never been any evidence proffered by CTI that shows E&GT paid any such value either in 1987 or 1998. In the absence of any compelling evidence or specific arguments from CTI, there is ample evidence in the record to support the jury's finding that no

14

equivalent value was ever paid by E&GT to CTI.

As such, we conclude that the jury had sufficient evidence with which to conclude that CTI conveyed the Neutron Road Property to E&GT in November 1998 in violation of TUFTA.

## II. Whether the Neutron Road Property was an "asset" as defined by TUFTA.

CTI argues that the Neutron Road Property was not an "asset," as defined by TUFTA, when it was transferred from CTI to E&GT.[5] Specifically, CTI claims that, in 1987, there was no equity in the Neutron Road Property because the property was subject to numerous liens. The government responds by referring to documentation revealing that various lending institutions accepted the Neutron Road Property as security from CTI on numerous occasions from 1987 through 1998.

In order for CTI to prevail on its argument that the Neutron Road Property was not an "asset" at the time CTI claims it was transferred, CTI must prove, as a preliminary matter, that the "transfer" occurred on May 13, 1987. As previously discussed, there was sufficient evidence presented to the jury to support its finding that the Neutron Road Property was not conveyed on May 13, 1987, but rather that the conveyance occurred when CTI recorded the warranty deed and purchase agreement on November 24, 1998.

---

[5] TUFTA defines an "asset" as "the property of a debtor," but an asset does not include, among other things, "property to the extent it is encumbered by a valid lien." TEX. BUS. & COMM. CODE § 24.002(2)(A).

15

Therefore, CTI must show that the Neutron Road Property was not an asset at the time of the recordation in 1998.

CTI focuses the entirety of its analysis of whether the Neutron Road Property was an asset on the period of time leading up to and including 1987. CTI fails to provide any evidence as to the absence of equity in the Neutron Road Property at the relevant time period in 1998. Meanwhile, there are numerous portions of the record revealing that the Neutron Road Property was the subject of security for at least eight separate loans between 1987 and 1998. It is axiomatic that a creditor would not extend a loan, much less eight separate loans, when the collateral made the basis for that loan lacked equity. Therefore, we find that there is sufficient evidence to support the jury's finding that the Neutron Road Property was an "asset" as contemplated by TUFTA when the property was transferred in 1998.

**III. Whether the Hypothecation Agreement put the government on constructive notice of CTI's "transfer" of the Neutron Road Property to E&GT, thereby triggering the relevant statute of limitations.**

The gravamen of CTI's statute of limitations argument is that the instruments that were recorded in 1987——particularly the Hypothecation Agreement——gave the world constructive notice that the Neutron Road Property had been transferred from CTI to E&GT. Stated differently, CTI claims Caddo (and therefore the government) can be charged with knowledge of the purported transfer because the Hypothecation Agreement said as much.

16

We have previously concluded that CTI was the owner of the Neutron Road Property until at least November 23, 1998. As such, whether the government was put on notice of the existence of the Hypothecation Agreement is irrelevant to our inquiry. Because the relevant transfer made the subject of the government's TUFTA suit is CTI's recordation of the warranty deed and purchase agreement on November 23, 1998, the focus of our inquiry is whether the government filed suit within the appropriate limitations period with respect to that date.

TUFTA states that "a cause of action with respect to a fraudulent transfer . . . is extinguished unless action is brought . . . within four years after the transfer was made." TEX. BUS. & COMM. CODE § 24.010(a)(1), (2). The government first filed suit under the FDCPA, seeking to satisfy its judgment against CTI on November 23, 1999, less than one year after CTI recorded the warranty deed and purchase agreement and well within the four-year statute of limitations. The government's second amended complaint added the TUFTA claim in August 2000. It is well settled that for limitation purposes, under Fed. R. Civ. P. 15(c), an amendment to a complaint will relate back to the date of the original complaint if the claim asserted in the amended pleading "arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." In re Coastal Plains, Inc., 179 F.3d 197, 216 (5th Cir. 1999) (internal quotation marks and

17

citations omitted).  It is clear that the government's original complaint and its second amended complaint both arose from its claim that CTI fraudulently transferred the Neutron Road Property to E&GT.  Therefore, we find that CTI's statute of limitations claim is without merit.

**IV.  Whether the trial court committed reversible error by permitting the jury to hear evidence concerning a prior conviction of CTI's President and CEO.**

CTI argues that the district court erred in admitting allegedly inflammatory evidence against Mort Zimmerman, the President and CEO of both CTI and E&GT.  The evidence at issue consists of an SBA form completed by Zimmerman as part of a loan application he submitted on behalf of E&GT in 1994.  The application form ("Government Exhibit No. 104") contained a section entitled "Statement of Personal History" in which Zimmerman denied ever being charged with, arrested for, or convicted of any criminal offense.  However, in a published 1981 opinion, the D.C. Circuit makes reference to the fact that Zimmerman, pursuant to an indictment returned in the United States District Court for the Southern District of Florida, in a matter involving sales of securities of another company, was fined $30,000 and placed on five years' probation on his plea of guilty to three counts of securities fraud and one count of mail fraud. SEC v. Savoy Indus., Inc., 665 F.2d 1310, 1312 n.3 (D.C. Cir. 1981).  The trial court admitted Government Exhibit No. 104 into evidence and permitted the

government to cross-examine Zimmerman on the discrepancy between his responses provided in the loan application and his prior guilty plea.

CTI argues that the loan application is inadmissible as a "prior bad act" under Fed. R. Evid. 404(b), and the improper admission of such evidence necessitates a new trial. In response, the government contends that the extrinsic evidence and the charged actions in this case, i.e., orchestrating fraudulent schemes through personal and representative misrepresentations and omissions, are not only relevant, but identical and thus should be accorded great probative value.

Normally, whether the district court erred in admitting Rule 404(b) evidence depends on whether its decision satisfies the two-prong Beechum test adopted by this Court for examining the admissibility of extrinsic evidence. Sanders, 343 F.3d at 517 (citing United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978)). Under the Beechum analysis, the court must first determine whether the extrinsic evidence is relevant to an issue other than the defendant's character, i.e., motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Id. at 518. Second, "the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403." Id. (citation omitted).

19

However, based on a review of the record, it appears that CTI's attorney failed to properly object to the introduction of Government Exhibit No. 104 on 404(b) grounds. Instead, CTI's counsel simply objected to the authentication of Zimmerman's signature on the application.[6] We find, therefore, that CTI's objections to the district court did not properly preserve the

---

[6] The following is an excerpt from the trial transcripts detailing the government's introduction of the 1994 SBA loan application:

> The Court:    Do you wish to offer this exhibit at this time?
> [The government]:   We do wish to offer this exhibit at this time.
> The Court:    Any objection?
> [CTI's attorney]:   And that is No. 104?  I believe we have already ruled on that preliminarily, judge.
> The Court:    Do you object to it?
> [CTI's attorney]:   Yes.
> The Court:    State the grounds for your objection.
> [CTI's attorney]:   In front of the jury?
> The Court:    That is what I am asking you to do. State the grounds for your objection. State the legal grounds for your objection without argument. I thought we set these ground rules at the pretrial conference.
> [CTI's attorney]:   Lack of personal knowledge as to the signature of Mr. Zimmerman for one; could not authenticate.
> The Court:    Any further objections?
> [CTI's attorney]:   Aside from what we talked to [sic] at the sidebar, no.
> The Court:    State for the record at this time the grounds for your objection to this exhibit. You have testified the lack of authenticity as to Mr. Zimmerman's signature. Do you have any further objections?
> [CTI's attorney]:   No, your honor.
> ...
> The Court:    If Mr. Zimmerman takes the stand, . . . is he going to deny his signature?
> [CTI's attorney]:   Probably not, your honor.

20

issue it now raises on appeal and we thus review CTI's Rule 404(b) challenge under the plain error doctrine. See Fed. R. Evid. 103(d).

Error is plain only when it is clear or obvious and it affects the defendant's substantial rights. United States v. Hickman, 331 F.3d 439, 443 (5th Cir. 2003). A defendant's substantial rights are only affected if the error affected the outcome of the district court proceedings. Id. (citation and quotation omitted). The defendant bears the burden of persuading the court that any such error was prejudicial. United States v. Daniels, 281 F.3d 168, 184 (5th Cir. 2002). Reversal for plain error is appropriate only in extreme circumstances where a miscarriage of justice would otherwise occur. United States v. Williams, 132 F.3d 1055, 1059 (5th Cir. 1998).

Rule 404(b) prohibits the use of prior bad acts as proof of the defendant's character. However, even had CTI made the proper 404(b) objection, Government Exhibit No. 104 and the corresponding testimony could have been admitted to prove intent to defraud. Even were we to conclude otherwise, such error would nonetheless not have risen to the level where CTI's substantial rights would have been affected, i.e., that the outcome of the trial would have been different. The district court set specific limitations on the scope and nature of the government's inquiry on the subject. Specifically, the district court limited the government's cross-examination of Zimmerman to his failure to answer the SBA's

21

application truthfully and did not allow the government to examine Zimmerman in depth concerning the specific facts underlying his prior indictments or convictions.  Thus, we find that the district court's admission of Government Exhibit No. 104 was clearly not plain error.

## CONCLUSION

Having carefully reviewed the record of this case, the parties' respective briefing and arguments, and for the reasons set forth above, we affirm the jury's findings that CTI transferred the Neutron Road Property to E&GT in violation of TUFTA, that E&GT did not take the property in good faith or for reasonably equivalent value, and that the government's claim was not barred by the statute of limitations.  In addition, we find that the district court did not err in permitting testimony regarding the past criminal conviction of CTI's president.

AFFIRMED.